## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re | Chapter 11 |
| ABT MOLECULAR IMAGING, INC.,[1] | Case No. 18-11398 (LSS) |
| Debtor. | |

## DECLARATION OF PETER KINGMA IN SUPPORT OF THE DEBTOR'S
## CHAPTER 11 PETITION AND REQUESTS FOR FIRST DAY RELIEF

Under 28 U.S.C. § 1746, I, Peter Kingma, hereby declare as follows under the penalty of perjury:

1.     From July 2013 through present, I have been the Chief Executive Officer and President of ABT Molecular Imaging, Inc. ("ABT," the "Company" or the "Debtor"). I also serve on ABT's board of directors and currently am ABT's only director.  Accordingly, I am very familiar with the Debtor's day-to-day operations, business, financial affairs, and books and records.  I am also familiar with the Debtor's turnaround and restructuring efforts.  Prior to joining ABT, I worked in a variety of capacities for five medical device companies, including spending twenty-three years with Siemens Medical Solutions. My education includes a HNDT Electronics Engineering from Cape Peninsula University in Cape Town, South Africa.

2.     On the date hereof (the "Petition Date"), ABT filed a voluntary petition with this Court for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").

---

[1] The last four digits of the Debtor's federal tax identification number are 0800 and its business address is 3024 Topside Business Park, Louisville, TN 37777.

3.      I submit this declaration (the "Declaration") in support of the Debtor's petition and the "first day" motions and applications, described further below (collectively, the "First Day Motions").  I am familiar with the contents of each First Day Motion (including the attachments thereto), and, to the best of my knowledge, after reasonable inquiry, discussions with other employees, and through my review of the Debtor's books, records, and other information, I believe that the relief sought by the Debtor in the First Day Motions: (a) is necessary to enable the Debtor to continue to operate as a debtor in possession during the course of its chapter 11 case with minimal interruption, (b) is critical to the Debtor's efforts to preserve value and maximize recoveries, and (c) best serves the Debtor's estate and its creditors' interests.  Further, I believe that the relief sought in the First Day Motions is narrowly tailored and necessary to achieve the goals of this chapter 11 case.

4.      Except as otherwise indicated, all statements in this Declaration are based upon (a) my personal knowledge, (b) my understanding of the Debtor's books and records, relevant documents, and other information prepared or collected by the Debtor's employees, management, or other professionals that I believe in good faith to be reliable, or (c) my opinion based on my experience with the Debtor's operations and financial condition.  If called upon to testify, I could and would competently testify to each of the facts set forth in this Declaration.  I am authorized to submit this Declaration on behalf of the Debtor.

## PART I: THE DEBTOR AND ITS INNOVATIVE BUSINESS

### A.      The Debtor's Business

5.      ABT designs, manufactures and distributes the world's first and only small-footprint Biomarker Generator ("BG-75") for Fludeoxyglucose ($^{18}$F) ("FDG"), the imaging

agent used in positron emission tomography ("PET").  ABT's BG-75 generates a "Dose on Demand™," producing a single discrete dose or multiple doses per batch of PET radiopharmaceuticals.  The BG-75 requires only 10% of the square footage required by a conventional cyclotron and radiopharmacy system and 75% fewer employees to operate. ABT is the only company providing a complete, end-to-end solution for on-site provision of FDG, from radioisotope to qualified, injection-ready clinical product within one hour. ABT completed development of the BG-75 in 2009, and delivered the first BG-75 unit to a well-known medical university in 2011.  Since shipping its first production unit, ABT has taken orders for 23 additional units to date from a diverse group of customers across five continents.

6.      ABT's mission is to provide technologies that produce PET biomarkers economically, on-demand and efficiently to the biotechnology and clinical fields, without the need for preexisting or in-depth PET radiochemistry or particle accelerator expertise. The Company targets research centers in the developed markets and emerging markets where access to the short-lived radioisotopes necessary for PET imaging is costly and limited or non-existent. The Company's self-contained BG-75 solution is uniquely tailored to increase global access to PET imaging.

7.      Since the BG-75 is often the only viable option for PET biomarkers in emerging markets, the decision to purchase a BG-75 is generally made in conjunction with the decision to acquire PET imaging equipment. Accordingly, ABT has sought to establish and maintain relationships with companies that distribute equipment complementary to, and necessary to justify the purchase of, a BG-75.

8.      Further, ABT is represented by proven distribution partners in key markets around the world.  These distributors typically operate in the nuclear medicine space and

distribute other oncology-related equipment, such as radiation therapy and diagnostic imaging. ABT supports these distributors through its dedicated BG-75 sales support teams located in the U.S. and Europe. Such relationships provide a single source for a new customer's oncology-related equipment needs and increase the likelihood that the sale of PET imaging equipment is accompanied by the sale of a BG-75.

9.      The sale of one BG-75 generates recurring annual consumables and service revenue streams over the life of the system. A BG-75 requires dose synthesis cards, reagent kits and consumables to operate. These consumables are unique to the BG-75 and are sold exclusively through ABT. Dose synthesis cards are single use per production batch and a new card must be used for each subsequent batch. A single reagent kit is used for a day's worth of production. Consumables are required to calibrate the quality control system detectors and perform the daily verification that the quality control system is within specifications. Historically, these consumables generate recurring annual revenue of approximately $175,000 per BG-75.

10.      In addition to the recurring consumables revenue, ABT generates revenue via the sale of annual service contracts. Service contracts average revenue of $80,000 per year for the contracted period and are implemented after the initial twelve-month warranty period expires. Combined with the recurring consumables revenue, ABT has historically generated approximately $1.3 million of incremental revenue per BG-75 over the five-year period following installation.

11.      Over the period of the twelve months ended on December 31, 2017, ABT had consolidated sales of $5,403,000 and a consolidated net loss of $5,516,000. As of December 31, 2017, its assets had a net book value of $2,507,000 and it had total liabilities of

$30,509,000.    This restructuring is required to adjust the Debtor's balance sheet or, alternatively, to permit a sale of the Debtor's business to a qualified purchaser.

**B.      The Debtor's Employees**

12.      ABT is comprised of 24 employees across its operations, research and development, administration and sales functions. The operations team of 13 employees handles production of the BG-75 and consumables and includes several field engineers that are dedicated to servicing customer contracts and providing post-sale customer-facing technical services. Research and development efforts are driven by a team of 7 professionals with extensive experience and education in engineering, physics and chemistry. Sales and marketing efforts are led by two seasoned professionals with over 40 years of collective experience in medical equipment sales.  Employees are primarily compensated on a salary basis.  None of the Company's employees are represented by a union.  ABT also works with independent contractors, who are not regular employees, but work full time hours.

**C.      The Debtor's Capital Structure**

13.      As of the Petition Date, ABT's funded debt consists of two secured term loan facilities agented by SWK Funding LLC ("SWK") and several unsecured loans from two of its shareholders, Intersouth Partners VII, L.P. ("Intersouth") and Mr. Ronald Nutt.

i.      *The First Lien Term Loan*

14.      Pursuant to that certain Loan and Security Agreement, dated March 16, 2011 (as amended, restated, supplemented or otherwise modified, the "First Lien Credit Agreement"), between ABT as borrower, SWK's predecessor, Square 1 Bank, as administrative agent, and the applicable lenders thereto (including by successorship, the "First Lien Lenders"), the First Lien Lenders provided ABT with a senior secured term loan facility

in an initial amount not to exceed $4 million (the "First Lien Term Loan").  The First Lien Credit Agreement was assigned to SWK, as agent and lender, in 2016 and has been amended several times to, *inter alia*, address certain defaults by ABT thereunder.  Pursuant to the First Lien Credit Agreement, the First Lien Term Loan is secured by a lien on all assets of ABT as well as a double negative lien on the ABT's intellectual property.  The interest rate under the First Lien Term Loan is variable and calculated as the greater of 6.50% or Prime plus 3.25%. The First Lien Term Loan is past its stated maturity and pursuant to the most recent amendment to the First Lien Credit Agreement, ABT is required to repay all amounts due to the First Lien Lenders under the First Lien Credit Agreement upon three business days' notice.  As of the Petition Date, the aggregate principal outstanding under the First Lien Term Loan is approximately $9,683,333, including $2,350,000 in amounts that were advanced from and after January 1, 2018. Upon entry of the final financing order, the post- January 1, 2018 advances under the First Lien Term Loan will be "rolled up" into the Debtor's postpetition financing facility.

      ii.    *The Second Lien Term Loan*

15.    Pursuant to that certain Second Lien Credit Agreement, dated October 10, 2014 (as amended, restated, supplemented or otherwise modified, the "Second Lien Credit Agreement"), between ABT as borrower, SWK, as administrative agent, and certain lenders thereto (the "Second Lien Lenders" and together with the First Lien Lenders, the "Prepetition Lenders"), the Second Lien Lenders provided ABT with a junior secured term loan facility in an initial amount not to exceed $10 million (the "Second Lien Term Loan").  The Second Lien Credit Agreement also provides for certain fees, costs, and expenses.  Pursuant to the Guarantee and Collateral Agreement by and among ABT and SWK, the Second Lien Term

Loan is secured by a junior lien on all ABT's assets.  The Second Lien Term Loan matures on October 8, 2021.  As of the Petition Date, the aggregate principal outstanding under the Second Lien Term Loan is approximately $16,161,455.

16.     An Intercreditor Agreement, dated October 10, 2014, by and among ABT and the agents under the First Lien Credit Agreement and Second Lien Credit Agreement confirms that the First Lien Lenders' security interest are senior and the security interests of the Second Lien Lenders are junior.

iii.     *Unsecured Debt*

17.     *Intersouth Notes.*     ABT entered into several subordinated unsecured promissory notes with Intersouth (collectively and as amended and modified, the "Intersouth Notes"), in the aggregate amount of $1,136,000, including: (i) a $750,000 note dated December 4, 2015, and (ii) three additional notes in 2016 totaling $386,000.  All such notes contain cross default provisions, bear interest at 8%, and include a 12% default interest rate.  All such notes are payable at 200% of the original amount, plus accrued interest, on December 31, 2018.  As of the Petition Date, the aggregate outstanding principal under the Intersouth Notes was $1,136,000.

18.     *Nutt Notes.*     ABT and Mr. Ronald Nutt also entered into two subordinated unsecured promissory notes (together, the "Nutt Notes"), in the aggregate amount of approximately $1.8 million, including: (i) a $879,534.20 note dated September 22, 2009 bearing interest at 4.38% annually, and (ii) a $1 million note dated April 24, 2010 bearing interest at 4.40% annually.  The outstanding principal and accrued interest will be payable in quarterly installments commencing on the last day of the first full calendar quarter following the fourth consecutive calendar quarter in which the Company's net income, determined in

accordance with GAAP, is greater than $0.00.  The quarterly installments are further limited to the lesser of (i) $73,000 and $83,000 per quarter plus accrued but unpaid interest or (ii) 25% of the Company's net income for the immediately preceding quarter.  As of the Petition Date, the aggregate outstanding principal under the Nutt Notes was $1,879,534.20.

19.    The Debtor also has unsecured trade debt in the approximate amount of $180,000 owed to approximately 65 trade vendors.

iv.    *Federal Grant Support*

20.    Additionally, ABT has received support through the Small Business Innovation Research ("SBIR") program. ABT was awarded a SBIR grant in 2015 for $1.7 million that has helped support its ongoing research and development activities.  As of the Petition Date, $1,218,852 of the SBIR grant had already been paid the Debtor.

v.    *The Debtor's Stock*

21.    Finally, as of the Petition Date, ABT had outstanding: (i) 26,362,039 shares of Series A Preferred Stock, (ii) 10,688,097 series of Series B Preferred Stock, (iii) 38,949,864 shares of Series C Preferred Stock, (iv) 11,893,430 shares of common stock, and (vi) various warrants to purchase common stock and certain preferred stock.

**PART II: KEY EVENTS LEADING TO**
**COMMENCEMENT OF THIS CHAPTER 11 CASE**

22.    ABT's management has been focused on raising capital to commercialize and develop the BG-75 and related products since ABT's initial formation.  Early efforts were focused on raising capital from strategic partners and other investors.  Eventually, ABT also took on the structured debt described above.  Although ABT has continued to develop relationships with key partners and distributors, the process of penetrating markets in

developing countries and negotiating agreements therein has proved time and capital intensive. While there is active interest in ABT's products throughout various markets, ABT's sales and support services have not generated enough revenue to support its operations.

23.     As a result, in 2015, ABT engaged an investment banker, SunTrust Robinson Humphrey, to assist with further capital raises or potentially a sale of the business.  That process did not yield further capital or a purchaser and ABT ended the engagement with SunTrust Robinson Humphrey in 2016.  In August 2017, ABT engaged SSG to further market the Company.

24.     In the ten months since its initial retention by ABT, SSG has contacted approximately sixty-two parties regarding ABT.  Of those parties, thirteen executed or were already parties to a non-disclosure agreement with ABT.  Certain parties that showed continued interest received access to the virtual data room and eight parties met with management regarding the opportunity.  Only one written offer was ultimately received and this party ultimately decided to not pursue the opportunity prior to executing a definitive purchase agreement.

25.     Throughout this process, ABT received incremental funding from SWK to enable ABT's business to operate and the marketing process to continue.  SWK was unwilling to continue to fund for an indefinite period of time and ABT ultimately determined that a chapter 11 filing was the best and only viable path to maximize the value of the Debtor's assets.  As a result, ABT and SWK negotiated a term sheet regarding post-petition financing for a chapter 11 process.  *See* Exhibit A.  SWK further agreed to sponsor a chapter 11 plan, in the event that an appropriate purchaser does not emerge through a sale process.  *See* Exhibit A.  SWK's plan term sheet would restructure the Debtor's prepetition balance sheet and

position the Debtor to exit from bankruptcy as a viable go-forward business.  In addition, the Debtor will consider all viable alternative proposals submitted in accordance with the bid procedures the Debtor will propose.

### PART III: THIS CHAPTER 11 CASE AND THE FIRST DAY PLEADINGS

26.     The Debtor has commenced this chapter 11 case to maximize the value of its assets through a restructuring or sale.  In connection with its petition, the Debtor has filed certain motions seeking relief designed to ensure a seamless transition between the Debtor's prepetition and postpetition business operations, facilitate a smooth reorganization or sale, and minimize any disruptions to the Debtor's operations.

27.     Concurrently with its chapter 11 petition, the Debtor is filing the following "First Day Motions" seeking orders granting various forms of relief.[2]  I have reviewed each of the First Day Motions, and I believe, among other things, the relief requested in the First Day Motions is necessary to enable the Debtor to operate with minimal disruption during the pendency of the chapter 11 case and approval of the relief sought therein will be critical to the Debtor's efforts to restructure and reorganize its business in a manner that preserves and maximizes value for the benefit of all stakeholders.  In addition, the Debtor soon will be filing certain additional motions to be considered at the "Second Day Hearing," including a motion for bid procedures and a motion to establish bar dates.

### A.  Claims Agent Application

28.     By the Claims Agent Application, the Debtor requests the entry of the Retention Order engaging and appointing Garden City Group, LLC ("GCG") as the Debtor's claims and noticing agent in connection with, among other things, the distribution of notices

---

[2] Capitalized undefined terms used in this section shall have the meanings set forth in the application First Day Motion.

and the administration, maintenance, processing, and docketing of proofs of claim filed in this Chapter 11 Case.

29.     I understand that the Debtor's selection of GCG to act as the claims and noticing agent satisfies the *United States Bankruptcy Court for the District of Delaware Protocol for the Employment of Claims and Noticing Agents under 28 U.S.C. § 156(c)* (the "Claims and Noticing Agent Protocol").

30.     In connection with the retention of GCG, the Debtor obtained and reviewed engagement proposals from three court-approved claims and noticing agents to ensure selection through a competitive process, including by requesting that certain of the claims and noticing agents provide their best and most competitive bids. I believe that, based on all engagement proposals obtained and reviewed, GCG's rates are competitive and reasonable given GCG's quality of services and expertise.

31.     I believe that the relief requested in the Claims Agent Application is in the best interests of the Debtor's estate, its creditors, and all other parties in interest.  Accordingly, on behalf of the Debtor, I respectfully submit that the Claims Agent Application Motion should be approved.

**B.   Cash Management Motion.**

32.     By the Cash Management Motion, the Debtor requests the entry of interim and final orders authorizing (i) the maintenance and continued use of the Debtor's existing cash management system and bank account, including the authority to pay routine prepetition banking fees owed to financial institution and (ii) the limited continued use of existing checks and business forms.

33.     As of the Petition Date, the Debtor maintains a bank account (the "Account") at Square 1 Bank (the "Bank") through which it operates its cash management system (the "Cash Management System").  The Debtor incurs certain fees and charges in connection with the ordinary course of operations (collectively, the "Bank Fees").  By the Cash Management Motion, the Debtor requests authority to continue to use its Cash Management System in place as of the Petition Date and to honor and pay applicable Bank Fees in the ordinary course of business, including Bank Fees prior to the Petition Date.

34.     The Debtor utilizes preprinted business forms in the ordinary course of its business (including, without limitation, letterhead, purchase orders, invoices and checks) (collectively, the "Business Forms").  I understand that, in connection with its chapter 11 case, the Debtor would be required by the United States Trustee (the "U.S. Trustee") under the *U.S. Trustee's Operating Guidelines for Chapter 11 Cases* (the "U.S. Trustee Guidelines") to incur the expense and delay of ordering entirely new business forms referencing the Debtor's status as debtor in possession absent relief from the Court.  By the Cash Management Motion, the Debtor requests that it be authorized to use its pre-existing Business Forms without such a reference in order to minimize expense to the estate.  To the extent the Debtor exhausts its existing supply of checks, the Debtor will reorder checks with the designation "Debtor-in-Possession" and the case number.

35.     I believe that the relief requested in the Cash Management Motion is in the best interests of the Debtor's estate, its creditors, and all other parties in interest. Accordingly, on behalf of the Debtor, I respectfully submit that the Cash Management Motion should be approved.

### C. **Employee Wages Motion**

36.     By the Employee Wage Motion, the Debtor seeks entry of interim and final orders authorizing, but not directing, the Debtor, in its sole discretion, to (a) pay and honor the prepetition claims of Employees and Independent Contractors for Unpaid Salary Obligations up to the statutory priority amount of $12,850 for each person, (b) maintain, continue and honor the Employee Benefit Plans and related obligations in the ordinary course of business, (c) to reimburse all Business Expenses in the ordinary course of business, and (d) pay and honor all Withholding Obligations (collectively, the "Employee Obligations").

37.     As of the Petition Date, the Debtor has approximately 24 employees, (collectively, the "Employees").  The Employees are all full-time and non-unionized workers. Eight of the Employees are paid hourly and all other Employees are salaried.

38.     In addition to its Employees, ABT supplements its workforce with two independently contracted consultants and one temporary accountant, hired through Accountemps (collectively, the "Independent Contractors").

39.     The Employees and Independent Contractors have knowledge of ABT's assets and operations, and customer relationships that are essential to ABT's ability to continue as a going concern for the benefit of its estate.  If ABT cannot assure the Employees and Independent Contractors that prepetition obligations to the Employees and Independent Contractors will promptly be paid and that benefits programs will continue, the Employees and Independent Contractors may experience significant personal hardship and seek other employment.

### i.    Compensation Obligations

40.    All Employees are paid salaries or wages (collectively, the "Salaries") biweekly, by direct deposit.  The average payroll is currently approximately $225,000, including related withholding and other tax obligations.  ABT estimates that, as of the Petition Date, there is an aggregate amount of approximately $70,169.40 in earned but unpaid Salaries, owed to Employees (the "Unpaid Base Compensation").

41.    The Independent Contractors are paid pursuant to the terms of their respective contracts. As of the Petition Date, the Debtor believes that it is current on payment obligations owed to the Independent Contractors.  In an abundance of caution, however, the Debtor requests authority to pay any prepetition obligations that arise, which have been earned by the Independent Contractors but remain unpaid (the "Unpaid IC Compensation" and together with the Unpaid Base Compensation, the "Unpaid Salary Obligations").

42.    The Debtor's last regular payroll date prior to the Petition Date was June 7, 2018, and the Debtor's next payroll is scheduled for June 21, 2018.  The Debtor estimates that approximately $70,169.40 in Unpaid Salary Obligations has accrued and is owed as of the Petition Date.

### ii.    Benefit Plans

38.    The Debtor has established certain benefit plans and policies for eligible Employees that provide certain medical, dental and vision plans, life insurance, disability insurance, a 401(k) plan and other benefits which are described in more detail below (collectively, the "Employee Benefit Plans").[3]  A brief description of the Employee Benefit Plans is provided below:

---

[3] The descriptions of the Debtor's benefit programs herein are provided as a summary only and are qualified in

a)      **Medical/Dental/Vision Plans**

39.      The Debtor maintains a choice of general health benefit plans administered by UnitedHealthcare (the "Employee Health Plans"), which are partly funded through monthly premiums deducted from the paychecks of participating Employees and partly funded by the Debtor.  The Debtor pays monthly premiums to the service providers.

40.      The Employees are also offered dental plans with Delta Dental (collectively, the "Dental Plans").  The Dental Plans are partly funded by participating Employees and partly funded by the Debtor.  Participating Employees pay their portion of the monthly premium, which the Debtor deducts from the participating Employees' paychecks.

41.      In addition, the Employees are offered vision plans with Humana (collectively, the "Vision Plans").  The Vision Plans are funded entirely by the Debtor.

42.      On account of the Employee Health Plans, Dental Plans and Vision Plans, the Debtor incurs an average monthly cost of $25,000, $2,200, and $305, respectively, of which Participating Employees fund approximately $5,000.00 per month.  As of the Petition Date, the Debtor believes that there are no accrued and unpaid monthly premiums or reimbursements in connection with the Employee Health Plans, Dental Plans and Vision Plans. By the Employee Wage Motion, the Debtor seeks authority to (a) continue to provide the Employee Health Plans, the Dental Plans and the Vision Plans for its Employees in the ordinary course of business, (b) continue to honor obligations under such benefit programs, including any premiums and administrative fees and (c) pay all such amounts owed under the Employee Health Plans, the Dental Plans and the Vision Plans to the extent that they remain unpaid on the Petition Date.

---

all respects by the actual terms of such programs.  Nothing contained herein shall have the effect of modifying any terms of such programs or any party's rights or obligations thereunder.

b)        **Income Protection Plans: Life and AD&D Insurance**

43.        The Employees are offered short-term (the "Short-Term Disability Insurance")
and long-term (the "Long-Term Disability Insurance") disability insurance covering 60% of
the Employees' weekly pre-disability earnings (collectively, the "Disability Insurance").  The
Short-Term Disability Insurance has a weekly maximum of $1,110 per Employee and the
Long-Term Disability Insurance has a monthly maximum of $8,500 per Employee.   In
addition, eligible full-time Employees are offered a basic life insurance benefit (the "Basic
Life Insurance"), which includes an accidental death and dismemberment benefit.   The
Employees are also offered voluntary life insurance and dependent life insurance in addition
to the Basic Life Insurance (the "Voluntary Life Insurance" and together with the Disability
Insurance and the Basic Life Insurance, the "Life Insurance Plans"), which are funded entirely
by participating Employees.  On average, the Debtor incurs a monthly cost of approximately
$1,300.00 in connection with the Life Insurance Plans.  As of the Petition Date, the Debtor
believes that there are no accrued and unpaid monthly premiums in connection with the Life
Insurance Plans.  By the Employee Wage Motion, the Debtor seeks authority to pay any and
all prepetition amounts owed on account of the Life Insurance Plans and to continue its
prepetition practices with respect to such benefits.

c)        **Retirement Plan**

43.        Employees are also eligible to enroll in a 401(k) plan with Principal Financial
Group (the "Retirement Plan").  Employees may contribute to the Retirement Plan each year
through salary deferrals up to the IRS limit.   The Debtor does not match Employee
contributions.  Employee contributions total approximately $700 per month and are remitted
biweekly, one week after the payroll.   Employees are always 100% vested in their

contributions and cannot forfeit the contributions.  Approximately two Employees currently participate and contribute to the Retirement Plan.  By the Employee Wage Motion, the Debtor seeks authority to continue to honor its obligations with respect to the Retirement Plan in the ordinary course of business.

### d)    Flexible Spending

44.    The Debtor offers its Employees the ability to contribute a portion of their compensation, which amounts are generally deducted automatically from each paycheck of a participating Employee, into flexible spending accounts for health and dependent care reimbursement (the "Flexible Spending Program").  The Debtors incur approximately $265.00 per month in costs associated with administration of the Flexible Spending Program.  Approximately five Employees participate in the Flexible Spending Program.  As of the Petition Date, the Debtor believes that there are no accrued and unpaid costs associated with the Flexible Spending Program.  By the Employee Wage Motion, the Debtor seeks authority to continue its prepetition practices with respect to the Flexible Spending Program.

### e)    Accrued Vacation and PTO

45.    ABT provides its Employees with 21 days of paid vacation time and 5 days of paid time off (together "PTO").  As of the Petition Date, the Employees have accrued approximately $53,593.60 in unused vacation time and paid time off (the "PTO Obligations").  Some Employees may be entitled under certain circumstances to be paid in cash for their accrued but unused vacation days up to a cumulative maximum of 80 hours, but not paid time off, upon the termination of their employment or otherwise.  By the Employee Wage Motion, ABT seeks authority to (a) allow its Employees to use their PTO in the form of paid time off

and (b) make cash payments for accrued but unused PTO Obligations in the ordinary course of the Debtor's business practice.

### iii.    Business Expenses

#### a)    General Business Expense Reimbursements

46.    Certain Employees are allowed certain business expense reimbursements including for, among other things, cell phone service, travel and meal expenses, expenses in connection with their employment duties, and other business expenses (collectively, the "General Business Expenses").   Employees submit expense reports detailing the General Business Expenses incurred, and the expense reports are channeled through a series of reviews for approval.   The Debtor's accounts payable department makes payments to Employees for General Business Expenses as expense reports are approved.

47.    Although the Debtor encourages the timely submission of expense reports for General Business Expenses, the Debtor anticipates that several Employees will have not yet submitted their expense reports for accrued and unpaid General Business Expenses.   The Debtor estimates that approximately $5,000 in General Business Expenses have been incurred but remain unpaid as of the Petition Date.   The Debtor's inability to pay the General Business Expenses to the individual Employees would adversely affect the Employees' morale and jeopardize the Debtor's reorganization efforts.   By the Employee Wage Motion, the Debtor seeks authority to continue its prepetition practices with respect to the General Business Expenses and to pay all prepetition amounts outstanding in connection therewith and for such postpetition expenses incurred in the ordinary course of its business to the extent that such approval is necessary

b)    **CEO Expense Reimbursements**

48.    In connection with my employment as Chief Executive Officer, and pursuant to my employment agreement, I am to be reimbursed for certain living expenses, including apartment rent and related utility and parking costs (collectively, the "CEO Expenses," and together with the General Business Expenses, the "Business Expenses").  As of the Petition Date, the Debtor believes that it is current on payments owed for CEO Expenses, but, in an abundance of caution, requests authority to pay any prepetition CEO Expenses that remain unpaid.

49.    I am independently liable for the CEO Expenses, and therefore, the Debtor's inability to pay the CEO Expenses could result in me seeking alternative employment, thereby jeopardizing the Debtor's reorganization efforts.  As discussed above, I have significant knowledge of ABT's assets and operations, and customer relationships that are essential to ABT's ability to continue as a going concern for the benefit of its estate.  Accordingly, by the Employee Wage Motion, the Debtor seeks authority to continue its prepetition practices with respect to the CEO Expenses and to pay all prepetition amounts outstanding in connection therewith and for such postpetition expenses incurred, pursuant to the terms of my employment agreement, and in the ordinary course of its business to the extent that such approval is necessary.

iv.    **Withholding Obligations**

51.    As an employer, the Debtor is required by law to withhold and remit federal, state and local taxes from Salaries and to pay social security taxes, Medicare taxes, state and federal unemployment insurance (collectively, the "Payroll Taxes").  The Debtor, in accordance with the Internal Revenue Code and applicable state law, pays an average of

$35,000.00 in biweekly Payroll Taxes.    As of the Petition Date, the Debtor owes approximately $9,600.00 for Payroll Taxes.

52.    In addition to applicable Payroll Taxes, the Debtor also withholds certain contributions to savings, retirement plans, insurance contributions and other amounts as applicable and are required to transmit such amounts to third parties (together with Payroll Taxes, the "Withholding Obligations").  The Debtor believes that such withheld funds, to the extent that they remain in the Debtor's possession, constitute moneys held in trust and therefore, are not property of the Debtor's estate.   Thus, whether or not such funds are prepetition amounts, the Debtor believes that directing such funds to the appropriate parties does not require Court approval.   Nevertheless, out of an abundance of caution, the Debtor seeks authority to pay any outstanding amounts owed for Withholding Obligations, in the ordinary course of business, including those incurred prior to the Petition Date.

53.    I believe that the relief requested in the Employee Wage Motion is in the best interests of the Debtor's estate, its creditors, and all other parties in interest.   Accordingly, on behalf of the Debtor, I respectfully submit that the Employee Wage Motion should be approved.

**D.  Insurance Motion**

54.    By the Insurance Motion, the Debtor seeks entry of interim and final orders (i) authorizing, but not directing, the Debtor to (a) continue to maintain and administer the Insurance Policies and revise, extend, renew, supplement, or change the Insurance Policies, as needed, (b) pay or honor obligations outstanding on account of the Insurance Policies in the ordinary course of business, (c) continue and renew or obtain new insurance premium

financing, and (ii) authorizing the Banks to honor and process related checks and electronic transfers.

55.    The Debtor maintains various insurance policies (each an "Insurance Policy" and collectively, the "Insurance Policies") through several different carriers (each an "Insurance Carrier," and collectively, the "Insurance Carriers") in the ordinary course of its business.  A list containing the Insurance Policies and the Insurance Carriers is attached to the Insurance Motion as Exhibit C.  The majority of the Insurance Policies have been obtained with the assistance of Willis of Tennessee Inc. (the "Broker").  The Insurance Policies vary in amounts and types of coverage and include, inter alia, (i) commercial general liability, (ii) products liability, (iii) workers' compensation and employers' liability, (iv) umbrella liability, and (v) directors' & officers' liability.

56.    The Insurance Policies are essential to the preservation of the Debtor's business, assets, and in many cases, such Insurance Policies are required by applicable regulations, laws, and contracts governing the Debtor's business and operations. Furthermore, section 1112(b)(4)(C) of the Bankruptcy Code provides that "failure to maintain appropriate insurance that poses a risk to the estate or to the public" is "cause" for mandatory conversion or dismissal of a chapter 11 case.   11 U.S.C. § 1112(b)(4)(C).  Moreover, I understand that maintenance of insurance coverage is required under the Operating Guidelines of the Office of the United States Trustee (the "Guidelines"), the Debtor's various contractual agreements, and/or prudent business practices.  *See, e.g.,* Operating Guidelines and Reporting Requirements for Debtors in Possession and Trustees, Office of the United States Trustee (Revised Jan. 6, 2010).

57.     The Debtor estimates that, on average, it pays approximately $86,011.00 on an annual basis on account of amounts owed for premiums, deductibles, and related fees.  The Debtor also pays the Broker a fee that is included in the premium (the "Broker Fee").

58.     Certain of the insurance premiums are paid directly to the Debtor's insurance premium financing lender, AFCO Credit Corporation (the "PFA Lender") as they become due.  Pursuant the Commercial Premium Finance Agreement, dated as of May 21, 2018, (the "Finance Agreement"), the PFA Lender has agreed to pay the insurance premiums of certain Insurance Policies in exchange for an upfront payment of $5,618.96 and 11 monthly payments of $5,618.96 each.  The Debtor is current on amounts due under the Finance Agreement as of the Petition Date.  The Debtor's obligations under the Finance Agreement are secured by all sums due under the Finance Agreement and any unearned premiums or other sums that may become payable under the Insurance Policies covered under the Finance Agreement.

59.     By the Insurance Motion, the Debtor requests authority to continue honoring its insurance obligations, making payments under the Finance Agreement, and paying the Broker Fee, in the ordinary course of business, including authority to pay any prepetition amounts that may be due and owing or that come due and owing in the ordinary course of business in an aggregate amount not to exceed $6,000.00 on an interim basis and $10,000.00 on a final basis.  In addition, the Debtor requests authority to renew any Insurance Policies and/or execute new insurance agreements in the ordinary course of business.

60.     The Insurance Policies are essential to the Debtor's business and the Debtor believes it is in the best interests of its estate to permit the Debtor to honor its obligations under the current Insurance Policies and Finance Agreement.  Any other alternative could

require considerable additional cash expenditures and would be detrimental to the Debtor's efforts to maximize the value of its estate.

61.     I believe that the relief requested in the Insurance Motion is in the best interests of the Debtor's estate, its creditors, and all other parties in interest.  Accordingly, on behalf of the Debtor, I respectfully submit that the Insurance Motion should be approved.

### E. **Tax Motion**

62.     By the Tax Motion, the Debtor seeks authority, pursuant to sections 105(a), 363, 507(a), and 541(d) of the Bankruptcy Code, to pay, in the Debtor's sole discretion, prepetition Taxes and Fees owed to the Taxing Authorities, including without limitation, Taxes and Fees subsequently determined to be owed for periods prior to the Petition Date, in an aggregate amount (excluding amounts paid prepetition by checks that have not yet cleared on the Petition Date) of up to $10,000.00 on a final basis and up to $1,000.00 total amount on an interim basis.

63.     In connection with the normal operation of its business, the Debtor incurs or collects and remits certain taxes including sales, use, franchise, property, business and occupation, and various other taxes, fees, charges, and assessments (collectively, the "Taxes and Fees") to various federal, state, and local taxing and regulatory authorities (collectively, the "Taxing Authorities").  The Debtor remits such Taxes and Fees to the Taxing Authorities in connection with the operation of its business and the sale of its products, or through shipments of products.  The Taxes and Fees are paid monthly, quarterly, semi-annually, or annually to the respective Taxing Authorities, depending on the given Tax or Fee and the relevant Taxing Authority to which it is paid.

64.     As of the Petition Date, the Debtor believes that it is current on prepetition Taxes and Fees.  In an abundance of caution, however, the Debtor seeks authority to pay any prepetition Taxes and Fees in the ordinary course of business owed to the Taxing Authorities; provided that payments on account of Taxes and Fees that accrued, in whole or in part, prior to the Petition Date but were not in fact paid or processed prior to the Petition Date shall not exceed $1,000.00 on an interim basis.

65.     The Debtor also requests that all banks and financial institutions on which checks to third parties are drawn and/or electronic payments are made pursuant to the Tax Motion be authorized to receive, process, honor, and pay any and all such checks (whether issued or presented prior to or after the Petition Date) and electronic payments, and to rely on the representations of the Debtor as to which checks are authorized to be paid.

66.     I believe that the relief requested in the Tax Motion is in the best interests of the Debtor's estate, its creditors, and all other parties in interest.  Accordingly, on behalf of the Debtor, I respectfully submit that the Tax Motion should be approved.

**F.  Utility Motion**

67.     By the Utility Motion, the Debtor seeks entry of interim and final orders: (i) prohibiting the Utility Companies (as defined below) from altering, refusing or discontinuing services to, or discriminating against, the Debtor as a result of the commencement of this case or on account of prepetition invoices; (ii) approving the Debtor's proposed form of adequate assurance; (iii) establishing procedures for resolving adequate assurance objections by the Utility Companies; and (iv) scheduling a Final Hearing.

68.     In the normal course of its business, the Debtor obtains Utility Services provided by several entities (each a "Utility Company" and collectively, the "Utility

Companies"), including those identified in the nonexclusive list attached to the Utility Motion as Exhibit C (the "Utilities List").

69.     The Debtor pays the Utility Companies, on average, approximately $5,720.00 per month for services rendered.  To the best of its knowledge, prior to the commencement of this case, the Debtor generally was current with respect to undisputed invoices for Utility Services.

70.     Based upon cash flow from operations and borrowings under the DIP Facility, the Debtor expects to have ample liquidity to timely pay all postpetition obligations owed to the Utility Companies

71.     Without the relief sought in the Utilities Motion, the Debtor could be forced to address requests by its Utility Companies in a disorganized manner during the critical first weeks of this case.  Moreover, the Debtor could be blindsided by a Utility Company unilaterally deciding on or after the 30th day following the Petition Date that it is not adequately protected and subsequently discontinuing service or making an exorbitant demand for payment to continue service.  Discontinuation of Utility Services could essentially shut down operations, and any significant disruption of operations could put this chapter 11 case in jeopardy.

72.     I believe that the relief requested in the Utilities Motion is in the best interests of the Debtor's estate, its creditors, and all other parties in interest.  Accordingly, on behalf of the Debtor, I respectfully submit that the Utilities Motion should be approved.

### G. "NOL" Motion

73.     By the NOL Motion, the Debtor requests the entry of Court ordered procedures as set forth herein to protect the potential value of certain net operating loss carryforwards and other tax attributes for use in connection with the reorganization of the Debtor.

74.     The Debtor has certain favorable attributes for U.S. federal income tax purposes (the "Tax Attributes"), which include, as of the Petition Date, roughly $47,266,428.00 in estimated, consolidated net operating loss carryforwards ("NOLs"). The Tax Attributes are valuable assets.

75.     Section 172 of the Internal Revenue Code of 1986 (as amended, the "Tax Code") permits corporate taxpayers to carry forward NOLs generated through December 31, 2017 for up to 20 subsequent tax years to offset future income in years following the years in which they were incurred, thereby reducing their federal income tax liability on such future income and significantly improving their cash position. For NOLs generated subsequent to January 1, 2018, the carry forward period is unlimited. Accordingly, absent any intervening limitations and depending upon the Debtor's future operating results, the Tax Attributes could translate into future tax savings over time and any such savings could enhance the Debtor's cash position for the benefit of all parties in interest and contribute to the Debtor's efforts toward a successful reorganization.

76.     The Debtor's ability to use the Tax Attributes to reduce future tax liability is subject to certain statutory limitations. I understand that Sections 382 and 383 of the Tax Code limit a corporation's use of its tax attributes to offset future income after that corporation has undergone an "ownership change" within the meaning of section 382 of the Tax Code ("Section 382" and such ownership change, an "Ownership Change"). And that,

pursuant to Section 382, an Ownership Change generally occurs when the percentage of a corporation's equity held by its "5-percent shareholders" (within the meaning of Section 382) increases by more than 50 percentage points above the lowest percentage of ownership owned by such shareholder(s) at any time during the relevant testing period (usually three years).  In addition, an Ownership Change can occur where a "50-percent shareholder" (within the meaning of Section 382(g)(4)(D) of the Tax Code) claims a worthlessness deduction in respect of its direct or indirect ownership of the corporation.

77.     The Debtor does not believe that an Ownership Change has occurred with respect to the Tax Attributes prior to the Petition Date and, accordingly, believes that it continues to have significant Tax Attributes that would be adversely affected (and could be effectively eliminated) by an Ownership Change during the pendency of this case.  This is due to the fact that the limitation imposed as a result of an Ownership Change (other than pursuant to a confirmed plan or court order in a tile 11 or similar case) is a function of the value of the equity of the corporation immediately before the Ownership Change and a prescribed rate published monthly by the Internal Revenue Service (the "IRS").  Accordingly, if such an Ownership Change occurs, the valuation for determining the annual amount of useable Tax Attributes would be at or close to zero, which may effectively eliminate the availability of such Tax Attributes.

78.     It is, therefore, in the best interests of the Debtor and its stakeholders to restrict actions that could result in an Ownership Change before the effective date of a chapter 11 plan or applicable bankruptcy court order.  This would protect the Debtor's ability to use the Tax Attributes during the pendency of this chapter 11 case or, potentially, in the event of a future transaction, to offset gain or other income recognized in connection with the Debtor's

sale or ownership of its assets, which may be significant in amount.  Although the limitations imposed by Section 382 may be significantly lessened when an Ownership Change occurs pursuant to a confirmed chapter 11 plan (or applicable court order), the benefits of a confirmed plan (or court order) will not be applied retroactively to reduce limitations on tax attributes imposed by a previous Ownership Change.

79.    I believe that the relief requested in the NOL Motion is in the best interests of the Debtor's estate, its creditors, and all other parties in interest.  Accordingly, on behalf of the Debtor, I respectfully submit that the NOL Motion should be approved.

**H. <u>Critical Vendor Motion</u>**

80.    By the Critical Vendor Motion, the Debtor requests, among other things, authority to pay, in the reasonable exercise of its business judgment and in its sole discretion, the Critical Vendor Claims, or a portion thereof, described herein that are essential to the uninterrupted functioning of the Debtor's business operations and who are not bound by contractual agreements with the Debtor.  The Debtor has proposed cap of $60,000 on payments to critical vendors in the interim period and a cap of $160,000 following entry of the final order. Additionally, by the Critical Vendor Motion, the Debtor seeks interim and final orders authorizing all applicable banks and financial institutions to receive, process, honor, and pay all checks presented for payment and all electronic payment requests made by the Debtor related to the Critical Vendor payments, whether such payments were presented or electronic requests were submitted before or after the date hereof.

81.    Before filing the Critical Vendor Motion, the Debtor, in consultation with its professionals, reviewed its accounts payable and undertook a process to identify those vendors truly essential to the its operations.  Thus, the Debtor concluded that each Critical

Vendor is absolutely critical as a sole source and irreplaceable provider. Any disruption in the supply of the goods or services provided by any Critical Vendor would likely result in immediate and irreparable harm to the Debtor's business and its estate by forcing it to divert resources to establish alternative sources for the applicable goods and services.

82.    In making the determination that a given vendor is a Critical Vendor, the Debtor consulted with appropriate members of its management team to identify those vendors essential to the Debtor's operations using the following criteria: (i) whether the vendor in question is a "sole source" provider; (ii) whether certain product-customizations prevent the Debtor from obtaining goods or services from alternative sources within a reasonable timeframe; (iii) if a vendor is not a sole source provider, whether the Debtor has sufficient goods in inventory to continue operations while a replacement vendor is procured; (iv) whether the Debtor has favorable pricing and other terms with the vendors that would be lost if the Debtor were to switch to a new vendor; (v) whether a vendor considered essential to the Debtor's operations under the criteria in (i), (ii), (iii), or (iv) is likely to refuse to continue providing goods or services postpetition if its prepetition claims are not paid; and (vi) whether the vendor might be able to obtain (or has obtained) mechanics liens, possessory liens, shippers liens or similar state law trade liens on property of the Debtor's estate.

83.    I believe that it is essential that the Debtor be authorized in its sole discretion to pay the Critical Vendor Claims to ensure the uninterrupted functioning of the Debtor's business operations.

84.    I believe that the relief requested in the Critical Vendor Motion is in the best interests of the Debtor's estate, its creditors, and all other parties in interest.  Accordingly, on

behalf of the Debtor, I respectfully submit that the Critical Vendor Motion should be approved.

## I. DIP Motion

85.     Subject to Court approval, the Debtor has negotiated and reached an agreement to enter into a debtor-in-possession credit facility with SWK for an aggregate amount of up to $4,000,000.00 (the "DIP Facility").  Pursuant to the DIP Motion, the Debtor seeks entry of an interim order authorizing the Debtor to borrow an initial amount of $950,000.00 to fund the Debtor's operations pending entry of a final order.  Following entry of the Final Order, the DIP Facility shall include $2,350,000 of bridge financing obligations provided under the Debtor's senior prepetition facility.

86.     As further described above, the Debtor has searched for strategic alternatives in various forms for several years.  The Debtor believes that, with the assistance of its advisors (current and former), it has exhausted the search for value maximizing transactions and a sale or plan transaction in this case represents the only available path forward.  The DIP Facility will provide the Debtor sufficient liquidity to finance its operations through the chapter 11 process.  The Debtor is also seeking authorization to use cash collateral on an interim basis, which, together with the DIP Facility, will be used by the Debtor to support its working capital requirements and other general corporate purposes as well as to satisfy the costs attendant to this chapter 11 case.  Without these expenditures, the Debtor will be forced to cease operations, which would result in irreparable harm to its business and an inability to preserve and maximize the value of its assets and operations.

87.     In my opinion, the terms and conditions of the DIP Facility and the use of cash collateral are fair and reasonable and were negotiated by the parties in good faith and at arm's

length after the Debtor and its advisors concluded a good faith effort to obtain financing for and market the Company for sale over a period of several years.  Given the unsuccessful prepetition search for alternatives and the Debtor's current financial position, I do not believe that the Debtor can obtain financing to fund and preserve its assets on terms more favorable than those offered by SWK under the DIP Facility and that the Debtor is (and has been) unable to obtain unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense.  I also do not believe that the Debtor is likely to obtain secured credit under section 364(c) of the Bankruptcy Code on equal or more favorable terms than those offered by SWK under the DIP Facility.

88.     The Debtor has determined, in its reasonable business judgment, that the DIP Facility is the best financing option available under the present circumstances and will enable the Debtor to operate its business in chapter 11 with minimal disruption while they prosecute a sale or restructuring.

89.     I believe that the relief requested in the DIP Motion is in the best interests of the Debtor's estate, its creditors, and all other parties in interest.  Accordingly, on behalf of the Debtor, I respectfully submit that the DIP Motion should be approved.

Pursuant to 28 U.S.C. § 1746, I declare under the penalty of perjury that the foregoing is true and correct.

Executed on June 13, 2018.

/s/
Peter Kingma
President and Chief Executive Officer of
ABT Molecular Imaging, Inc.