**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re | Chapter 11 |
| ABT MOLECULAR IMAGING, INC.,[1] | Case No.  18-11398 (LSS) |
| Debtor. | |

**DISCLOSURE STATEMENT FOR THE DEBTOR'S AMENDED PLAN OF**
**REORGANIZATION UNDER CHAPTER 11 OF THE BANKRUPTCY CODE**

BAYARD, P.A.
Justin R. Alberto (No. 5126)
Erin R. Fay (No. 5268)
600 N. King Street, Suite 400
Wilmington, Delaware 19801
Telephone: (302) 655-5000
Facsimile: (302) 658-6395
Email: jalberto@bayardlaw.com
           efay@bayardlaw.com

*Counsel for the Debtor and Debtor in Possession*

Dated:  September 26, 2018

THIS IS NOT A SOLICATION OF ACCEPTANCE OR REJECTION OF THE PLAN. ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT. THE DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT TO DATE.

---

[1] The last four digits of the Debtor's federal tax identification number are 0800 and its business address is 3024 Topside Business Park, Louisville, TN 37777.

## DISCLAIMER

**ABT Molecular Imaging, Inc. as chapter 11 debtor and debtor in possession ("ABT" or the "Debtor"), is sending you this document and the accompanying materials (the "Disclosure Statement") because you may be a creditor entitled to vote on the Debtor's Amended Chapter 11 Plan of Reorganization, as the same may be amended from time to time (the "Plan").[2]**

**Pursuant to section 1128 of the Bankruptcy Code, a confirmation hearing will be held with respect to the Plan on _____, 2018 at _____ (ET) before the Honorable Laurie S. Silverstein, United States Bankruptcy Judge, in the United States Bankruptcy Court for the District of Delaware, 824 North Market Street, 6th Floor, Wilmington, Delaware 19801. Objections to confirmation of the Plan must be filed and served no later than _____ at 4:00 p.m. (ET) in compliance with the Disclosure Statement Order, or else they may not be considered by the Bankruptcy Court. The Confirmation Hearing may be adjourned from time to time without further notice.**

**The deadline to accept or reject the Plan is *4:00 p.m. (ET) on _____* (the "Voting Deadline") unless the Debtor extends the Voting Deadline. To be counted, a ballot ("Ballot") indicating acceptance or rejection of the Plan must be actually received by Garden City Group, LLC (the "Balloting Agent") no later than the Voting Deadline.**

**The Debtor cannot assure you that the Plan, including any exhibits thereto, that is ultimately approved by the Bankruptcy Court in the Chapter 11 Case (a) will contain any of the terms described in this Disclosure Statement or the attached Plan or (b) will not contain different, additional, or material terms that do not appear in this Disclosure Statement of the attached Plan. The Debtor urges each holder of a Claim entitled to vote on the Plan (i) to read and consider carefully this entire Disclosure Statement (including the Plan and the matters described under the "Risk Factors" section below) and (ii) to consult with its own advisors with respect to reviewing this Disclosure Statement, the Plan and each of the proposed transactions contemplated thereby prior to deciding whether to vote to accept or reject the Plan. A creditor entitled to vote on the Plan should not rely on this Disclosure Statement for any purpose other than to determine whether to vote to accept or reject the Plan.**

**If the Plan is confirmed by the Bankruptcy Court and the Effective Date occurs, all holders of Claims against, and Equity Interests in, the Debtor (including those holders of Claims or Equity Interests who do not submit Ballots to accept or reject the Plan, to the extent applicable, or who are not entitled to vote on the Plan) will be bound by the terms of the Plan and the transactions contemplated thereby.**

---

[2]     Capitalized terms defined in this Disclosure Statement shall be used as defined herein whenever appearing in capitalized form, regardless of whether appearing in the singular, plural or possessive form(s). All capitalized terms not otherwise defined in this Disclosure Statement shall have the meanings set forth in the Plan; to the extent such terms are not defined in the Plan, they shall have the meanings ascribed under section 101 of the Bankruptcy Code.

This Disclosure Statement contains, among other things, summaries of the Plan, certain statutory provisions, certain events in the Chapter 11 Case and certain documents related to the Plan that are attached hereto or have been, or will be, separately filed with the Bankruptcy Court.  Although the Debtor believes that these summaries are fair and accurate, these summaries are qualified in their entirety to the extent that the summaries do not set forth the entire text of such documents or statutory provisions or every detail of such events.  In the event of any conflict, inconsistency or discrepancy between a description in this Disclosure Statement and the terms and provisions of the Plan or any other such documents, the Plan or such other documents will govern and control for all purposes.  Except where otherwise specifically noted, factual information contained in this Disclosure Statement is based upon information that is publicly available or provided by the Debtor's management.  The Debtor may have not independently verified all of the information contained in this Disclosure Statement, and, as such, makes no representation or warranty that the information contained herein or attached hereto is without any material inaccuracy or omission.

The financial information contained in or incorporated by reference into this Disclosure Statement has not been audited, except as specifically indicated otherwise.  The financial projections (the "Financial Projections") attached hereto as Exhibit B, the estimated projected recoveries discussed elsewhere in this Disclosure Statement, and the liquidation analysis attached hereto as Exhibit C (the "Liquidation Analysis") have been or will be prepared by the Debtor's management in consultation with its advisors.  The Financial Projections, estimates, and analyses, while presented with numerical specificity, necessarily are based on a variety of estimates and assumptions that are inherently uncertain and may be beyond the control of the Debtor's management.  Important factors that may affect actual results and cause forecasts to not be achieved include risks and uncertainties relating to the Reorganized Debtor's ability to achieve strategic goals, objectives and targets over applicable periods, industry performance, the regulatory environment, general business and economic conditions and other factors.  The Debtor cautions that no representations can be made as to the accuracy of these projections, estimates, or analyses or to the ultimate performance of the Debtor compared to the information contained in the forecasts or that the forecasted results will be achieved.  Therefore, the financial projections, estimates, and the liquidation analysis may not be relied upon as a guarantee or other assurance that the actual results will occur.

Holders of Claims entitled to vote to accept or reject the Plan must rely on their own evaluation of the Debtor and their own analyses of the terms of the Plan in deciding whether to vote to accept or reject the Plan.  Importantly, prior to deciding whether and how to vote on the Plan, each holder of a Claim in a voting class should review the Plan in its entirety and consider carefully all of the information in this Disclosure Statement and any exhibits hereto, including the risk factors described in greater detail in herein, and the Plan Supplement.

As to contested matters, adversary proceedings and other Causes of Action, this Disclosure Statement will not constitute or be construed as an admission of any fact or liability, or as a stipulation or waiver, but rather as a statement made in settlement negotiations.  Nor will it be construed to be conclusive advice on the tax, securities, or other legal effects of the Plan

as to holders of Claims against or Equity Interests in the Debtor. You are advised to obtain independent expert advice on such subjects.

This Disclosure Statement has been prepared in accordance with section 1125 of the Bankruptcy Code and Bankruptcy Rule 3016(b) and not necessarily in accordance with federal or state securities laws or other nonbankruptcy law. The Disclosure Statement and Plan have not been approved or disapproved by the SEC or any state securities commission and neither the SEC nor any state securities commission has passed upon the accuracy or adequacy of the information contained herein. Any representation to the contrary is a criminal offense. Neither the solicitation of the Plan nor this Disclosure Statement constitutes an offer to sell nor the solicitation of an offer to buy securities in any state or jurisdiction in which such offer or solicitation is not authorized.

The equity interests issued under the Plan will not be registered under the securities act of 1933 (as amended, the "Securities Act") or similar state securities or "blue sky" laws. The offer and issuance is being made in reliance on the exemption from registration under the Securities Act, including section 4(a)(2) thereof, or as specified in section 1145 of the Bankruptcy Code, as applicable. The issuance of the equity interests under the Plan has been neither approved nor disapproved by the SEC or by any state securities commission or similar public, governmental, or regulatory authority, and neither the SEC nor any such state authority has passed upon the accuracy or adequacy of the information contained in this Disclosure Statement or upon the merits of the Plan. Any representation to the contrary is a criminal offense.

Safe harbor statement under the Private Securities Litigation Reform Act of 1995: all forward-looking statements contained herein or otherwise made by the Debtor involve material risks and uncertainties and are subject to change based on numerous factors, including factors that are beyond the Debtor's control. Accordingly, the Debtor's future performance and financial results may differ materially from those expressed or implied in any such forward-looking statements. Such factors include those described in this Disclosure Statement. The Debtor does not undertake to publicly update or revise forward-looking statements even if experience or future changes make it clear that any projected results expressed or implied therein will not be realized.

## TABLE OF CONTENTS

**Page**

I.  INTRODUCTION ................................................................................................. 1

II.  IMPORTANT INFORMATION ABOUT THE DISCLOSURE STATEMENT .............. 1

III.  QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE STATEMENT
  AND THE PLAN ................................................................................................... 2
  A.  What is chapter 11? ..................................................................................... 2
  B.  Why is ABT sending me this Disclosure Statement? .................................. 3
  C.  Am I entitled to vote on the Plan? ............................................................... 3
  D.  How do I vote on the Plan and what is the Voting Deadline? ..................... 4
  E.  Why is the Bankruptcy Court holding a Confirmation Hearing and when is
    the Confirmation Hearing set to occur? ...................................................... 4
  F.  What is the purpose of the Confirmation Hearing? ..................................... 4
  G.  What is the effect of the Plan on ABT's ongoing business? ....................... 4
  H.  Who do I contact if I have additional questions with respect to this Disclosure
    Statement or the Plan? ................................................................................. 5
  I.  Does ABT recommend voting in favor of the Plan? .................................... 5

IV.  GENERAL INFORMATION CONCERNING ABT ................................................... 5
  A.  Overview of ABT and its Business ............................................................... 5
  B.  ABT's Prepetition Capital Structure ............................................................. 6
  C.  Equity Interests. ............................................................................................ 8
  D.  Events Leading to the Chapter 11 Filing ...................................................... 8

V.  EVENTS DURING THE CHAPTER 11 CASE ........................................................ 9
  A.  Commencement of Chapter 11 Case and First Day Orders ......................... 9
  B.  Additional Events in the Case ....................................................................... 11

VI.  SUMMARY OF THE PLAN OF REORGANIZATION ............................................. 12
  A.  Summary of Treatment of Claims and Equity Interests under the Plan ....... 12
  B.  General Basis for the Plan ............................................................................. 14
  C.  Plan Objectives .............................................................................................. 14
  D.  Classification and Allowance of Claims and Interests Generally ................ 14
  E.  Classification and Treatment of Unclassified Claims under the Plan .......... 15
    1.  Administrative Claims ...................................................................... 15
    2.  Fee Claims ........................................................................................ 16
    3.  DIP Facility Claims .......................................................................... 16
    4.  Priority Tax Claims .......................................................................... 16
  F.  Classification and Treatment of Classified Claims and Equity Interests under the  Plan .. 17
    1.  Class 1 – Prepetition SWK Claims .................................................. 17
    2.  Class 2 – Other Priority Claims ....................................................... 17
    3.  Class 3 – Other Secured Claims ....................................................... 17
    4.  Class 4 – General Unsecured Claims ............................................... 18
    5.  Class 5 – Subordinated Claims ........................................................ 18

|  | 6. | Class 6–Equity Interests | 18 |
| G. | | Corporate Governance of the Reorganized Debtor | 19 |
|  | 1. | Organizational Documents | 19 |
|  | 2. | The Reorganized Debtor's Officers and Board of Directors | 19 |
| H. | | Means of Implementing the Plan | 19 |
|  | 1. | Operations Between the Confirmation Date and Effective Date | 19 |
|  | 2. | Issuance of New Common Stock. | 19 |
|  | 3. | Continued Corporate Existence and Vesting of Assets. | 20 |
|  | 4. | Preservation of Causes of Action. | 20 |
|  | 5. | Corporate Action. | 21 |
| I. | | Claims Objections and Distributions On Account of Allowed Claims | 21 |
|  | 1. | Objections to Claims. | 21 |
|  | 2. | Claim Amendments. | 21 |
|  | 3. | Delivery of Distributions in General. | 21 |
|  | 4. | Distribution of Cash. | 22 |
|  | 5. | No Fractional or De Minimis Distributions. | 22 |
|  | 6. | Saturdays, Sundays, or Legal Holidays. | 22 |
|  | 7. | Distributions to Holders of Claims. | 22 |
|  | 8. | Undeliverable Distributions | 22 |
|  | 9. | Compliance with Tax Requirements | 23 |
|  | 10. | Time Bar to Cash Payments. | 24 |
|  | 11. | Foreign Currency Exchange Rates. | 24 |
|  | 12. | Setoffs. | 24 |
|  | 13. | Claims Paid or Payable by Third Parties. | 24 |
|  | 14. | Special Rules for Distributions to Holders of Disputed Claims. | 24 |
|  | 15. | Interest on Claims. | 25 |
|  | 16. | Allocation of Consideration. | 25 |
|  | 17. | Estimation. | 25 |
|  | 18. | Insured Claims. | 25 |
| J. | | Executory Contracts and Unexpired Leases | 26 |
|  | 1. | Asssumption and Rejection of Executory Contracts and Unexpired Leases. | 26 |
|  | 2. | Cure of Defaults for Assumed Executory Contracts and Unexpired Leases. | 26 |
|  | 3. | Reservation of Rights. | 27 |
|  | 4. | Insurance Policies. | 28 |
|  | 5. | Employee Compensation and Benefits Programs and Agreements | 28 |
|  | 6. | Post-Petition Contracts and Leases. | 28 |
| VII. | | Discharges, Releases and Injunctions | 29 |
| A. | | General Settlement of Claims and Interests. | 29 |
| B. | | Subordination of Claims. | 29 |
| C. | | Discharge of the Debtor. | 29 |
| D. | | Release of Liens. | 30 |
| E. | | Releases by the Debtor. | 30 |
| F. | | Exculpation. | 31 |
| G. | | Injunction. | 32 |
| H. | | Limitations on Exculpations and Releases | 33 |
| I. | | Preservation of Insurance. | 33 |

VIII.  CONDITIONS PRECEDENT to CONFIRMATION AND CONSUMMATION OF THE
       PLAN .............................................................................................................. 33
   A.  Conditions Precedent to Effectiveness................................................................33
   B.  Effective Date of the Plan ...................................................................................34
   C.  Waiver of Conditions Precedent to the Effective Date .......................................34
   D.  Effect of Failure of Conditions ...........................................................................34
   E.  Modification of Plan ............................................................................................34
   F.  Revocation or Withdrawal of the Plan.................................................................34

IX.    JURISDICTION OF BANKRUPTCY COURT.................................................... 35
   A.  Retention of Jurisdiction ......................................................................................35

X.     MISCELLANEOUS PROVISIONS....................................................................... 36
   A.  Immediate Binding Effect....................................................................................36
   B.  Governing Law. ....................................................................................................37
   C.  Filing or Execution of Additional Documents.....................................................37
   D.  Term of Injunctions or Stays................................................................................37
   E.  Exemption From Transfer Taxes. ........................................................................37
   F.  Plan Supplement. ..................................................................................................37
   G.  Conflicts. ..............................................................................................................38

XI.    GENERAL INFORMATION ON VOTING AND CONFIRMATION PROCEDURE.. 38
   A.  Voting On the Plan................................................................................................38
   B.  Voting Record Date ..............................................................................................38
       1.  Who May Vote ..............................................................................................39
       2.  Eligibility.......................................................................................................40
       3.  Binding Effect ...............................................................................................40
   C.  Procedure/Voting Deadlines .................................................................................40
   D.  Plan Confirmation Process....................................................................................41
       1.  Requirements..................................................................................................41
       2.  Confirmation Hearing ...................................................................................44

XII.   RISK FACTORS ..................................................................................................... 44
   A.  Bankruptcy Factors...............................................................................................44
       1.  Classifications of Claims and Equity Interests...............................................44
       2.  Non-Occurrence of the Effective Date............................................................44
       3.  Failure to Receive Requisite Accepting Votes...............................................44
       4.  Nonconsensual Confirmation .........................................................................45
       5.  Failure to Confirm the Plan............................................................................45
       6.  Risk of Additional or Larger Claims..............................................................46
       7.  Alternative Chapter 11 Plan ..........................................................................46
       8.  Variances from Projections ............................................................................46
       9.  Certain tax considerations ..............................................................................46
       10. The Debtor's emergence from chapter 11 is not assured ...............................47

XIII.  CERTAIN FEDERAL INCOME TAX CONSEQUENCES............................................ 47

    A.    Certain U.S. Federal Income Tax Consequences to the Debtor and Reorganized
            Debtor .............................................................................................................48
    B.    Certain U.S. Federal Income Tax Consequences to Holders of Allowed Claims ............49
    C.    Importance of Obtaining Professional Tax Assistance ......................................................50

XIV.    ALTERNATIVES TO THE PLAN .................................................................................. 51

XV.    RECOMMENDATIONS ................................................................................................. 51

XVI.    CONCLUSION............................................................................................................... 51

## I.    INTRODUCTION

ABT submits this Disclosure Statement, dated September __, 2018 in connection with the solicitation of acceptances with respect to the Plan.  A copy of the Plan is attached hereto as Exhibit A and incorporated herein by reference.  This Disclosure Statement describes certain aspects of the Plan, including the treatment of holders of Claims and Equity Interests, and also describes certain aspects of the Debtor's operations, financial projections, and other related matters.

The purpose of this Disclosure Statement is to set forth information (a) regarding the Debtor's history, its business and the Chapter 11 Case, (b) concerning the Plan and alternatives to the Plan, (c) advising the holders of Claims against and Equity Interests in the Debtor of their rights under the Plan, (d) assisting the holders of Claims against the Debtor that are eligible to vote in making an informed judgment regarding whether they should vote to accept or reject the Plan, and (e) assisting the Bankruptcy Court in determining whether the Plan complies with the provisions of chapter 11 of the Bankruptcy Code and should be confirmed.

After giving effect to the transactions contemplated by the Plan, the Debtor will emerge from chapter 11 and will be appropriately capitalized with access to financing to support its emergence and go-forward business needs.

**ABT BELIEVES THAT THE COMPROMISES CONTEMPLATED UNDER THE PLAN ARE FAIR AND EQUITABLE, MAXIMIZE THE VALUE OF THE ESTATE AND PROVIDE THE BEST RECOVERY TO CLAIM HOLDERS.  AT THIS TIME, THE DEBTOR BELIEVES THIS IS THE BEST AVAILABLE ALTERNATIVE FOR COMPLETING THE CHAPTER 11 CASE.  FOR THESE REASONS AND OTHERS DESCRIBED HEREIN, THE DEBTOR STRONGLY RECOMMENDS THAT CREDITORS ENTITLED TO VOTE ON THE PLAN VOTE TO ACCEPT THE PLAN.**

## II.    IMPORTANT INFORMATION ABOUT THE DISCLOSURE STATEMENT

This Disclosure Statement provides information regarding the Plan.  The Debtor believes that the Plan is in the best interests of all creditors and urges all holders of Claims entitled to vote on the Plan to accept the Plan.

Unless the context requires otherwise, any references to *"we," "our" and "us"* are to the Debtor.

The confirmation and effectiveness of the Plan are subject to certain material conditions precedent described herein and in the Plan.  There is no assurance that the Plan will be confirmed, or if confirmed, that the conditions required to be satisfied for the Effective Date to occur will be satisfied (or waived).

Summaries of the Plan and statements made in this Disclosure Statement are qualified in their entirety by reference to the Plan, this Disclosure Statement, and the Plan Supplement, and any exhibits, schedules or amendments thereto, as applicable, and the summaries of the financial information and the documents annexed to this Disclosure Statement, or otherwise incorporated herein by reference, are qualified in their entirety by reference to those documents.  The

statements contained in this Disclosure Statement are made only as of the date of this Disclosure Statement, and there is no assurance that the statements contained herein will be correct at any time after such date.  Except as otherwise provided in the Plan or in accordance with applicable law, the Debtor is under no duty to update or supplement this Disclosure Statement.

The information contained in this Disclosure Statement is included for purposes of soliciting acceptances to, and confirmation of, the Plan and may not be relied on for any other purpose.  The Debtor believes that the summary of certain provisions of the Plan and certain other documents and financial information contained or referenced in this Disclosure Statement is fair and accurate.

The Debtor has sought to ensure the accuracy of the financial information provided in this Disclosure Statement, but the financial information contained in, or incorporated by reference into, this Disclosure Statement has not been, and will not be, audited or reviewed by the Debtor's independent auditors unless explicitly stated herein.

The Debtor is relying on Bankruptcy Code section 1145(a) to exempt from registration under the Securities Act and state securities laws the offer, issuance, and distribution of equity interests to be issued under the Plan.  Upon confirmation of the Plan, the equity interests described in this Disclosure Statement will be issued without registration under the Securities Act, or similar federal, state, local, or foreign laws, in reliance on the exemption set forth in Bankruptcy Code section 1145.  To the extent exemptions from registration other than Bankruptcy Code section 1145 apply, such securities may not be offered or sold except pursuant to a valid exemption or upon registration under the Securities Act, including section 4(a)(2) of the Securities Act.

## III.    QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE STATEMENT AND THE PLAN

### A.    What is chapter 11?

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code.  In addition to permitting debtor rehabilitation, chapter 11 promotes equality of treatment for similarly situated creditors and similarly situated equity interest holders, subject to the priority of distributions prescribed by the Bankruptcy Code.

The commencement of a chapter 11 case creates an estate that comprises all of the legal and equitable interests of the debtor as of the bankruptcy commencement date.  The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor in possession."

Consummating a plan is the principal objective of a chapter 11 case.  The Bankruptcy Court's confirmation of a plan binds the debtor, any person acquiring property under the plan, any creditor or equity interest holder of a debtor, and any other person or Entity as may be ordered by the Bankruptcy Court, in accordance with the applicable provisions of the Bankruptcy Code.  Subject to certain limited exceptions, the order issued by the Bankruptcy Court confirming a plan provides for the treatment of the debtor's debt in accordance with the terms of the confirmed plan.

**B.      Why is ABT sending me this Disclosure Statement?**

ABT will be seeking to obtain Bankruptcy Court approval of the Plan.  In connection with soliciting acceptances of the Plan, Bankruptcy Code section 1125 requires ABT to prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding acceptance of the Plan.  This Disclosure Statement has been prepared in accordance with these requirements.

**C.      Am I entitled to vote on the Plan?**

Your ability to vote on, and your distribution under, the Plan, if any, depends on what type of Claim or Equity Interest you hold.  Each category of holders of Claims or Equity Interests, as set forth in Article III of the Plan pursuant to Bankruptcy Code section 1122(a), is referred to as a "Class."

Pursuant to the provisions of the Bankruptcy Code, only Classes of claims or equity interests that are "impaired" and receiving a distribution under a plan may vote to accept or reject such plan.  Generally, a claim or interest is impaired under a plan if the holder's legal, equitable, or contractual rights are changed under such plan.  In addition, Classes of Claims or Equity Interests that are "unimpaired" are deemed to have accepted the Plan and do not cast votes on the Plan, and Classes of Claims or Equity Interests that are "impaired" but are not receiving distributions under the Plan are deemed to have rejected the Plan and do not vote on the Plan.

Under the Plan, unclassified Claims and holders of Claims in Classes 2 and 3 are Unimpaired and therefore deemed to accept the Plan.  Holders of Claims in Class 1 are Impaired and are entitled to vote on the Plan.  Holders of Claims and Equity Interests in Classes 4, 5, and 6 are Impaired and are not entitled to vote on the Plan.

**ACCORDINGLY, A BALLOT FOR ACCEPTANCE OR REJECTION OF THE PLAN IS BEING PROVIDED ONLY TO HOLDERS OF CLAIMS IN CLASS 1.**

The respective voting status for unclassified Claims and each Class of Claims is set forth below.

The tables below designate the Classes of Claims against and Equity Interests in the Debtor and specify which of those Classes are Impaired or Unimpaired by the Plan.  FOR A COMPLETE DESCRIPTION OF THE DEBTOR'S CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS, SEE ARTICLES II and III OF THE PLAN.

| Class | Claim or Equity Interest | Status | Voting Rights |
|-------|--------------------------|--------|---------------|
| 1 | Prepetition SWK Claims | Impaired | Entitled to Vote |
| 2 | Other Priority Claims | Unimpaired | Deemed to Accept |
| 3 | Other Secured Claims | Unimpaired | Deemed to Accept |
| 4 | General Unsecured Claims | Impaired | Deemed to Reject |
| 5 | Subordinated Claims | Impaired | Deemed to Reject |
| 6 | Equity Interests | Impaired | Deemed to Reject |

**D.      How do I vote on the Plan and what is the Voting Deadline?**

        If you are entitled to vote to accept or reject the Plan, a Ballot for the acceptance or rejection of the Plan is enclosed for the purpose of voting on the Plan.  Detailed instructions regarding how to vote on the Plan are contained on the Ballots distributed to holders of Claims that are entitled to vote on the Plan.  For your vote to be counted, your Ballot must be completed, signed and submitted so that it is **actually received** by the Balloting Agent by 4:00 p.m. (ET) on _____, 2018 (unless extended by the Debtor).  See "**General Information on Voting and Confirmation Procedure**" Section XI of this Disclosure Statement for additional information.

        If you are a holder of a Claim entitled to vote on the Plan and you did not receive a Ballot, received a damaged Ballot or lost your Ballot, or if you have any questions concerning the Disclosure Statement, the Plan or the procedures for voting on the Plan, please contact the Balloting Agent at (866) 459-6078 or by online submission at http://cases.gcginc.com/mii/contact.php.

**E.      Why is the Bankruptcy Court holding a Confirmation Hearing and when is the Confirmation Hearing set to occur?**

        Bankruptcy Code section 1128(a) requires the Bankruptcy Court to hold a hearing on Confirmation of the Plan and recognizes that any party in interest may object to Confirmation of the Plan.

        The Confirmation Hearing has been set for _____, 2018 at _____ (ET).  The Confirmation Hearing may be adjourned or continued from time to time without further notice except for an announcement of the adjourned date made at the Confirmation Hearing or on the Bankruptcy Court's docket.

        Objections to Confirmation of the Plan must be filed and served on counsel to the Debtor and certain other parties on or before _____, 2018 at 4:00 p.m. (ET).

**F.      What is the purpose of the Confirmation Hearing?**

        The confirmation of a plan of reorganization by a bankruptcy court binds the debtor, any issuer of securities under the plan of reorganization, any person acquiring property under the plan of reorganization, any creditor or equity interest holder of a debtor and any other person or entity as may be ordered by the Bankruptcy Court in accordance with the applicable provisions of the Bankruptcy Code.  Subject to certain limited exceptions, the order issued by a bankruptcy court confirming a plan of reorganization discharges a debtor from any debt that arose before the confirmation of the plan of reorganization and provides for the treatment of such debt in accordance with the terms of the confirmed plan of reorganization.

**G.      What is the effect of the Plan on ABT's ongoing business?**

        ABT is reorganizing under chapter 11 of the Bankruptcy Code.  As a result, subject to the occurrence of the Effective Date, Confirmation means that ABT will not be liquidated or forced to go out of business.  Rather, ABT will continue to operate its business after the Effective Date.

Following Confirmation, the Plan will be consummated on the Effective Date, which is a date selected by ABT that is a Business Day on or after the Confirmation Date on which (i) no stay of the Confirmation Order is in effect and (ii) the conditions to the effectiveness of the Plan specified in the Plan have been satisfied, or if capable of being waived, waived.

On or after the Effective Date, and unless otherwise provided in the Plan, Reorganized ABT will continue in business and, except as otherwise provided by the Plan, may use, acquire or dispose of property and compromise or settle any Claims, Equity Interests or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules. Additionally, upon the Effective Date, all actions contemplated by the Plan will be deemed authorized and approved.

**H.      Who do I contact if I have additional questions with respect to this Disclosure Statement or the Plan?**

If you have any questions regarding this Disclosure Statement or the Plan, you may contact ABT's counsel at the address and phone number listed on the cover page of this Disclosure Statement. Copies of the Plan and this Disclosure Statement may be obtained by contacting (i) ABT's counsel or (ii) the Balloting Agent at (866) 459-6078 or by online submission at http://cases.gcginc.com/mii/contact.php.

**I.      Does ABT recommend voting in favor of the Plan?**

Yes. ABT believes the Plan provides for a larger distribution to ABT's creditors than would otherwise result from any other available alternative. ABT believes the Plan, which preserves the operations of ABT's business, is in the best interest of all creditors, and that other alternatives fail to realize or recognize the value inherent under the Plan.

## IV.      GENERAL INFORMATION CONCERNING ABT

**A.      Overview of ABT and its Business**

ABT designs, manufactures and distributes the world's first and only small-footprint Biomarker Generator ("BG-75") for Fludeoxyglucose (18F) ("FDG"), the imaging agent used in positron emission tomography ("PET"). ABT's BG-75 generates a "Dose on Demand™," producing a single discrete dose or multiple doses per batch of PET radiopharmaceuticals. The BG-75 requires only 10% of the square footage required by a conventional cyclotron and radiopharmacy system and 75% fewer employees to operate. ABT is the only company providing a complete, end-to-end solution for on-site provision of FDG, from radioisotope to qualified, injection-ready clinical product within one hour. ABT completed development of the BG-75 in 2009, and delivered the first BG-75 unit to a well-known medical university in 2011. Since shipping its first production unit, ABT has taken orders for 23 additional units to date from a diverse group of customers across five continents.

ABT's mission is to provide technologies that produce PET biomarkers economically, on-demand and efficiently to the biotechnology and clinical fields, without the need for preexisting or in-depth PET radiochemistry or particle accelerator expertise. The Company targets research centers in the developed markets and emerging markets where access to the

short-lived radioisotopes necessary for PET imaging is costly and limited or non-existent. The Company's self-contained BG-75 solution is uniquely tailored to increase global access to PET imaging.

Since the BG-75 is often the only viable option for PET biomarkers in emerging markets, the decision to purchase a BG-75 is generally made in conjunction with the decision to acquire PET imaging equipment. Accordingly, ABT has sought to establish and maintain relationships with companies that distribute equipment complementary to, and necessary to justify the purchase of, a BG-75.

Further, ABT is represented by proven distribution partners in key markets around the world. These distributors typically operate in the nuclear medicine space and distribute other oncology-related equipment, such as radiation therapy and diagnostic imaging. ABT supports these distributors through its dedicated BG-75 sales support teams located in the U.S. and Europe. Such relationships provide a single source for a new customer's oncology-related equipment needs and increase the likelihood that the sale of PET imaging equipment is accompanied by the sale of a BG-75.

The sale of one BG-75 generates recurring annual consumables and service revenue streams over the life of the system. A BG-75 requires dose synthesis cards, reagent kits and consumables to operate. These consumables are unique to the BG-75 and are sold exclusively through ABT. Dose synthesis cards are single use per production batch and a new card must be used for each subsequent batch. A single reagent kit is used for a day's worth of production. Consumables are required to calibrate the quality control system detectors and perform the daily verification that the quality control system is within specifications. Historically, these consumables generate recurring annual revenue of approximately $175,000 per BG-75.

In addition to the recurring consumables revenue, ABT generates revenue via the sale of annual service contracts. Service contracts average revenue of $80,000 per year for the contracted period and are implemented after the initial twelve-month warranty period expires. Combined with the recurring consumables revenue, ABT has historically generated approximately $1.3 million of incremental revenue per BG-75 over the five-year period following installation.

Over the period of the twelve months ended on December 31, 2017, ABT had consolidated sales of $5,403,000 and a consolidated net loss of $5,516,000. As of December 31, 2017, its assets had a net book value of $2,507,000 and it had total liabilities of $30,509,000.

## B.    ABT's Prepetition Capital Structure

As of the Petition Date, ABT's funded debt consists of two secured term loan facilities agented by SWK Funding LLC ("SWK") and several unsecured loans from two of its shareholders, Intersouth Partners VII, L.P. ("Intersouth") and Mr. Ronald Nutt.

### 1.    The First Lien Term Loan

Pursuant to that certain Loan and Security Agreement, dated March 16, 2011 (as amended, restated, supplemented or otherwise modified, the "First Lien Credit Agreement"),

between ABT as borrower, SWK's predecessor, Square 1 Bank, as administrative agent, and the applicable lenders thereto (including by successorship, the "First Lien Lenders"), the First Lien Lenders provided ABT with a senior secured term loan facility in an initial amount not to exceed $4 million (the "First Lien Term Loan").  The First Lien Credit Agreement was assigned to SWK, as agent and lender, in 2016 and has been amended several times to, *inter alia*, address certain defaults by ABT thereunder.

Pursuant to the First Lien Credit Agreement, the First Lien Term Loan is secured by a lien on all assets of ABT as well as a double negative lien on the ABT's intellectual property. The interest rate under the First Lien Term Loan is variable and calculated as the greater of 6.50% or Prime plus 3.25%.  The First Lien Term Loan is past its stated maturity and pursuant to the most recent amendment to the First Lien Credit Agreement, ABT is required to repay all amounts due to the First Lien Lenders under the First Lien Credit Agreement upon three business days' notice.  As of the Petition Date, the aggregate principal outstanding under the First Lien Term Loan is approximately $9,683,333.

### 2.    The Second Lien Term Loan

Pursuant to that certain Second Lien Credit Agreement, dated October 10, 2014 (as amended, restated, supplemented or otherwise modified, the "Second Lien Credit Agreement"), between ABT as borrower, SWK, as administrative agent, and certain lenders thereto (the "Second Lien Lenders" and together with the First Lien Lenders, the "Prepetition Lenders"), the Second Lien Lenders provided ABT with a junior secured term loan facility in an initial amount not to exceed $10 million (the "Second Lien Term Loan").  The Second Lien Credit Agreement also provides for certain fees, costs, and expenses.

Pursuant to the Guarantee and Collateral Agreement by and among ABT and SWK, the Second Lien Term Loan is secured by a junior lien on all ABT's assets.  The Second Lien Term Loan matures on October 8, 2021.  As of the Petition Date, the aggregate principal outstanding under the Second Lien Term Loan is approximately $16,161,455.

An Intercreditor Agreement, dated October 10, 2014, by and among ABT and the agents under the First Lien Credit Agreement and Second Lien Credit Agreement confirms that the First Lien Lenders' security interest are senior and the security interests of the Second Lien Lenders are junior.

### 3.    Unsecured Debt

*Intersouth Notes*.  ABT entered into several subordinated unsecured promissory notes with Intersouth (collectively and as amended and modified, the "Intersouth Notes"), in the aggregate amount of $1,136,000, including: (i) a $750,000 note dated December 4, 2015, and (ii) three additional notes in 2016 totaling $386,000.  All such notes contain cross default provisions, bear interest at 8%, and include a 12% default interest rate.  All such notes are payable at 200% of the original amount, plus accrued interest, on December 31, 2018.  As of the Petition Date, the aggregate outstanding principal under the Intersouth Notes was $1,136,000.

*Nutt Notes*.  ABT and Mr. Ronald Nutt also entered into two subordinated unsecured promissory notes (together, the "Nutt Notes"), in the aggregate amount of approximately $1.8

million, including: (i) a $879,534.20 note dated September 22, 2009 bearing interest at 4.38% annually, and (ii) a $1 million note dated April 24, 2010 bearing interest at 4.40% annually. The outstanding principal and accrued interest will be payable in quarterly installments commencing on the last day of the first full calendar quarter following the fourth consecutive calendar quarter in which the Company's net income, determined in accordance with GAAP, is greater than $0.00. The quarterly installments are further limited to the lesser of (i) $73,000 and $83,000 per quarter plus accrued but unpaid interest or (ii) 25% of the Company's net income for the immediately preceding quarter. As of the Petition Date, the aggregate outstanding principal under the Nutt Notes was $1,879,534.20.

*Trade Debt*. The Debtor also has unsecured trade debt in the approximate amount of $252,000 owed to approximately 65 trade vendors.

**4.    Federal Grant Support**

Additionally, ABT has received support through the Small Business Innovation Research ("SBIR") program. ABT was awarded a SBIR grant in 2015 for $1.7 million that has helped support its ongoing research and development activities. As of the Petition Date, $1,218,852 of the SBIR grant had already been paid the Debtor.

**C.    Equity Interests.**

As of the Petition Date, ABT had outstanding: (i) 26,362,039 shares of Series A Preferred Stock, (ii) 10,688,097 series of Series B Preferred Stock, (iii) 38,949,864 shares of Series C Preferred Stock, (iv) 11,893,430 shares of common stock, and (vi) various warrants to purchase common stock and certain preferred stock.

**D.    Events Leading to the Chapter 11 Filing**

ABT's management has been focused on raising capital to commercialize and develop the BG-75 and related products since ABT's initial formation. Early efforts were focused on raising capital from strategic partners and other investors. Eventually, ABT also took on the structured debt described above. Although ABT has continued to develop relationships with key partners and distributors, the process of penetrating markets in developing countries and negotiating agreements therein has proved time and capital intensive. While there is active interest in ABT's products throughout various markets, ABT's sales and support services have not generated enough revenue to support its operations.

As a result, in 2015, ABT engaged an investment banker, SunTrust Robinson Humphrey, to assist with further capital raises or potentially a sale of the business. That process did not yield further capital or a purchaser and ABT ended the engagement with SunTrust Robinson Humphrey in 2016. In August 2017, ABT engaged SSG Capital Advisors, LLC ("SSG") to further market the Company.

In the ten months between its initial retention by ABT and the Petition Date, SSG contacted approximately sixty-two parties regarding ABT. Of those parties, thirteen executed or were already parties to a non-disclosure agreement with ABT. Certain parties that showed continued interest received access to the virtual data room and eight parties met with

management regarding the opportunity. Only one written offer was ultimately received and this party ultimately decided to not pursue the opportunity prior to executing a definitive purchase agreement.

Throughout the prepetition marketing process, ABT received incremental funding from SWK to enable ABT's business to operate and the process to continue. SWK was unwilling to continue to fund for an indefinite period of time and ABT ultimately determined that a chapter 11 filing was the best and only viable path to maximize the value of the Debtor's assets. As a result, ABT and SWK negotiated a term sheet regarding post-petition financing for a chapter 11 process. Further, SWK further agreed to sponsor a chapter 11 plan, in the event that an appropriate purchaser does not emerge during the chapter 11 case. Although the post-petition sales process is on-going, the Debtor and SWK have negotiated the Plan and have determined that the Plan and this Disclosure Statement should be filed at this time to enable an efficient dual tracked process.

## V.    EVENTS DURING THE CHAPTER 11 CASE

### A.    Commencement of Chapter 11 Case and First Day Orders

On the Petition Date and shortly thereafter, in addition to the voluntary petition for relief filed by ABT under chapter 11 of the Bankruptcy Code, ABT also filed certain "first day" motions and applications (collectively, the "First Day Motions") with the Bankruptcy Court. The Bankruptcy Court entered several orders to, among other things: (i) prevent interruptions to the Debtor's business; (ii) ease the strain on the Debtor's relationships with certain essential constituents; (iii) allow the Debtor to retain certain advisors necessary to assist the Debtor with the administration of the Chapter 11 Case; and (iv) obtain use of postpetition financing and cash collateral (each, a "First Day Order"). The First Day Motions and First Day Orders are described in more detail below:

    1.    Employee Wages and Benefits and Independent Contractor Payments

As of the Petition Date, the Debtor employed approximately 24 people that provide services to the Debtor (the "Employees"). The Debtor also contracted with 2 independent contractors for additional accounting services. To ensure the continuity of services by its Employees and the independent Contractors, the Debtor sought and the Bankruptcy Court entered certain orders (i) permitting the Debtor to pay prepetition wages, salaries, and other compensation to the Employees and the independent Contractors and pay prepetition payroll taxes and benefits and continue benefit programs in the ordinary course, and (ii) directing banks to honor checks for payment or prepetition payment and program obligations [D.I. 25, 60, and 107].

    2.    Cash Management Systems

As part of a smooth transition into this Chapter 11 Case, the Debtor sought and the Bankruptcy Court entered certain orders authorizing the Debtor to (i) continue using the Debtor's existing cash management system, and (ii) maintain existing bank accounts and business forms [D.I. 34, and 96]. Subsequent to the entry of the interim order permitting the Debtor to continue the use of its existing cash management system, the Debtor's prepetition bank indicated that it

would not execute the agreements required by the United States Trustee in order for it to continue to hold the Debtor's accounts and the Debtor transitioned its accounts to an alternative, approved bank.

3.    Critical Vendors

The Debtor relies on its vendors to, among other things, supply essential replacement parts and supplies, services, equipment and certain other goods required to operate the Debtor's business and ensure continuous operations.  The disruption of goods and services by any of these vendors would impede the Debtor's ability to continue operations.  Therefore, the Bankruptcy Court entered a First Day Order authorizing the Debtors to pay prepetition claims of certain critical vendors in the interim amount of $60,000.00 [D.I. 30].  On July 16, 2018, the Court entered a Final Order authorizing the Debtor to pay its critical vendors in the aggregate amount of $160,000.00 [D.I. 111].

4.    Taxes and Fees

The Debtor believes that, in some cases, certain taxing, regulatory, and governmental authorities had the ability to exercise rights and remedies if the Debtor failed to remit certain taxes and fees.  Accordingly, the Debtor sought entry of orders authorizing the Debtor to pay certain fees and taxes to avoid harm to the Debtor's business operations, notwithstanding the fact that, as of the Petition Date, the Debtor believed that it was current on all prepetition taxes.  Therefore, the Bankruptcy Court entered a First Day Order authorizing the Debtor to pay certain taxes and fees in the interim amount of $1,000.00 [D.I. 27].  On July 13, 2018, the Court entered a Final Order permitting the Debtor to pay certain taxes and fees in the aggregate amount of $10,000.00 [D.I. 103].

5.    Insurance Policies

The Debtor maintains various insurance policies through several different carriers, which the Debtor believes are essential to the preservation of the Debtor's assets and business.  Moreover, the Debtor believes that, in many cases, the maintenance of certain of the insurance policies is required by applicable law, regulations and contracts governing the Debtor's business and operations, including, without limitation, by the Bankruptcy Code and the Operating Guidelines of the Office of the United States Trustee.    In addition, certain of the premiums under the insurance policies are paid through an insurance premium financing agreement (the "Financing Agreement"), which obligation is secured by liens in favor of the premium financing lender on all sums due under the Financing Agreement and any unearned premiums or other sums that may be payable under the applicable insurance policies.  Therefore, the Debtor filed a First Day Motion seeking authority to make certain payments on prepetition obligations, including payments to the Debtor's premium financing lender under the Financing Agreement, that the Debtor believed to be necessary to preserve the various insurance policies and the Bankruptcy Court entered a First Day Order authorizing the Debtor to pay certain prepetition obligations related to its insurance policies in the interim amount of $6,000.00 [D.I. 27].  On July 13, 2018, the Court entered a Final Order permitting the Debtor to pay the prepetition obligations related to its insurance policies in the aggregate amount of $10,000.00 [D.I. 93].

6.      Utilities

Section 366 of the Bankruptcy Code protects debtors from utility service cutoffs upon a bankruptcy filing while providing utility companies with adequate assurance that the debtors will pay for postpetition services.  To ensure uninterrupted utility service, the Debtor filed a First Day Motion seeking entry of an order approving procedures for, among other things, determining adequate assurance for utility providers and prohibiting utility providers from altering, refusing or discontinuing services without further order by the Bankruptcy Court.  Therefore, the Bankruptcy Court entered a First Day Order approving the relief requested in this motion on an interim basis [D.I. 28] and, on July 13, 2018, the Bankruptcy Court entered a Final Order approving the relief requested in this motion [D.I. 94].

7.      Tax Attributes

The Debtor has certain favorable attributes for U.S. federal income tax purposes, which include, as of the Petition Date, roughly $47,266,428.00 in estimated, consolidated net operating loss carryforwards ("NOLs").   The Debtor believes that the NOLs are valuable assets. Therefore, the Debtor filed a First Day Motion seeking to establish procedures to protect the potential value of NOL carryforwards and other tax attributes for use in connection with the reorganization of the Debtor under the Plan and the Bankruptcy Court entered a First Day Order approving the relief requested in this motion on an interim basis [D.I. 29] and, on July 13, 2018, the Bankruptcy Court entered a Final Order approving the relief requested in this motion [D.I. 95].

8.      Debtor-in-Possession Financing and Use of Cash Collateral

On the Petition Date, the Debtor filed a motion [D.I. 12] seeking approval to, among other things, (i) enter into a debtor-in-possession credit facility with SWK for an aggregate amount of up to $4,000,000.00 (the "DIP Facility") and (ii) obtain use of SWK's cash collateral, in each case to provide the Debtor with access to sufficient liquidity to fund operational and other expenses during the Chapter 11 Case.  In addition, this motion sought to provide SWK with certain adequate protection.  The Bankruptcy Court entered a First Day Order authorizing (i) the Debtor to enter into the proposed debtor-in-possession credit facility, and borrow an initial amount of $950,000.00 to fund the Debtor's operations pending entry of final approval; (ii) the Debtor's use of SWK's cash collateral and (iii) the provision of adequate protection to SWK [D.I. 33].  On July 16, 2018, the Bankruptcy Court entered a Final Order authorizing (i) the Debtor to borrow up to $1.65 million under the debtor-in-possession financing facility and (ii) the Debtor's use of cash collateral, on a final basis [D.I. 108].

**B.      Additional Events in the Case**

In addition to the above-referenced motions and orders, the Debtor has also filed certain motions seeking to (i) set bar dates for the filing of proofs of claim [D.I. 55], (ii) retain certain Professionals and ordinary course professionals [D.I. 2, 24, 54, 56, 57, and 58], and (iii) establish procedures for the interim compensation of Professionals [D.I. 53].

Additionally, on June 18, 2018, the Debtor filed a motion [D.I. 45] (the "Sale Motion") seeking approval of bidding and sale procedures for the potential sale of substantially all of its assets as a potential alternative to the transaction proposed under the Plan.  As described above,

the process under the Sale Motion is proceeding on a dual track with the filing of the Plan and this Disclosure Statement.    To date, the Debtor has undertaken negotiations with two primary parties during the course of the chapter 11 case regarding a sale transaction. As of September __, 2018, the Debtor remains in discussions with one party regarding a potential transaction.  To the extent that such transaction is fully negotiated in a manner acceptable to the Debtor and its stakeholders, the Debtor may seek approval of such sale in addition to, or instead of, seeking confirmation of the Plan.

The Debtor has also been in communications with multiple vendors and customers related to the filing of the cases and the Debtor's intentions with respect to such parties' Executory Contracts and continuing business relationships.   The Debtor has successfully negotiated the resolution of many such issues.

Throughout the case, the Debtor and the Prepetition SWK Secured Parties have engaged in substantial and good faith discussions related to the Plan and the Debtor's path to emergence. The Plan, as amended, is the culmination of those efforts and includes compromises and agreements between the parties.

## VI.    SUMMARY OF THE PLAN OF REORGANIZATION

The following sections summarize the salient provisions of the Plan.  This summary refers to, and is qualified in its entirety by, reference to the Plan, a copy of which is attached hereto as Exhibit A.  Parties are encouraged to review the Plan in its entirety for a full understanding of its provisions and its impact on holders of Claims and Equity Interests.

### A.    Summary of Treatment of Claims and Equity Interests under the Plan

The table below summarizes the classification and treatment of Claims and Equity Interests under the Plan, as well as the estimated recovery for each Class.  Unless otherwise indicated, the characteristics and amount of the Claims or Equity Interests in the following Classes are based on the books and records of ABT, as of the date hereof.

The estimated recovery percentages set forth below have been calculated based upon a number of assumptions, including the estimated amount of Allowed Claims or Allowed Equity Interests in each Class.

THE EXPECTED RECOVERIES SET FORTH BELOW ARE FOR ILLUSTRATIVE PURPOSES ONLY AND ARE SUBJECT TO MATERIAL CHANGE.

| Class | Description | Treatment | Estimated Amount and  Recovery: |
|---|---|---|---|
| N/A | Administrative Claims | Payment in full (or as otherwise agreed). | Estimated Amount: $400,000 - $1,000,000<br><br>Estimated Recovery: 100% |

| Class | Description | Treatment | Estimated Amount and Recovery: |
|---|---|---|---|
| N/A | DIP Facility Claims | Unless otherwise agreed, the DIP Facility Claims shall be converted into obligations under the Exit Term Loan Facility. | Estimated Amount: $1,650,000<br><br>Estimated Recovery: Settled |
| N/A | Priority Tax Claims | Payment in full on the Effective Date, or regular installment payments over five years from the Effective Date or payment as otherwise agreed. | Estimated Amount: $0- $10,0000<br><br>Estimated Recovery: 100% |
| Class 1 | Prepetition SWK Claims | Except to the extent that the holders of the Prepetition SWK Claims and the Debtor agree in writing to less favorable treatment, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, the Allowed Prepetition SWK Claims, the Prepetition SWK Secured Parties shall receive their Pro Rata share of 100% of the New Stock in Reorganized ABT and the portion of the Exit Term Loan Note not attributable to the DIP Facility Claims distribution. | Estimated Amount: $26,434,349<br><br>Estimated Recovery: Settled |
| Class 2 | Other Priority Claims | Payment in full on the Effective Date (or as otherwise agreed). | Estimated Amount: $0- $10,0000<br><br>Estimated Recovery: 100% |
| Class 3 | Other Secured Claims | Payment in full on the Effective Date (or as otherwise agreed). | Estimated Amount: $0- $10,0000<br><br>Estimated Recovery: 100% |
| Class 4 | General Unsecured Claims | Holders of Allowed General Unsecured Claims shall not receive any distributions under the Plan. | Estimated Amount: $3,000,000- $4,000,000<br><br>Estimated Recovery: 0% |

| Class | Description | Treatment | Estimated Amount and  Recovery: |
|-------|-------------|-----------|----------------------------------|
|  |  |  |  |
| Class 5 | Subordinated Claims | Holders of Allowed Subordinated Claims shall not receive any distributions under the Plan. | Estimated Amount: None<br><br>Estimated Recovery: N/A |
| Class 6 | Equity Interests | Cancelled. | Estimated Amount: N/A<br><br>Estimated Recovery: 0% |

ABT BELIEVES THAT THE PLAN PROVIDES THE BEST RECOVERIES POSSIBLE FOR HOLDERS OF CLAIMS AGAINST ABT AND THUS STRONGLY RECOMMENDS THAT YOU VOTE TO ACCEPT THE PLAN.

**NOTHING IN THE DISCLOSURE STATEMENT SHALL AFFECT THE RIGHTS OF ABT, OR REORGANIZED ABT, AS APPLICABLE, TO OBJECT TO ANY PROOF OF CLAIM OR PROOF OF INTEREST ON ANY GROUND OR FOR ANY PURPOSE, INCLUDING IN ACCORDANCE WITH THE PROCEDURES SET FORTH IN THE PLAN.**

**B.      General Basis for the Plan**

ABT has determined that a prolonged Chapter 11 Case would damage its ongoing business operations and threaten its viability as a going concern.  The nature of the Plan (as set forth in the Plan and described herein) allows the Debtor to exit chapter 11 quickly, while the provisions of the Plan allow ABT to reduce its debt service obligations, extend the maturity of its debt, and position ABT for ongoing operations.

**C.      Plan Objectives**

The primary objectives of the Plan are to:  (i) maximize the value of the ultimate recovery to all holders of Claims on a fair and equitable basis, compared to the value they would receive if ABT's assets were liquidated under chapter 7 of the Bankruptcy Code; and (ii) settle, compromise or otherwise dispose of certain Claims on terms believed to be fair and reasonable in the best interests of ABT, and its creditors and interest holders.  ABT believes that through the Plan, holders of Allowed Claims will obtain a recovery substantially better than any recovery they would receive if ABT's assets were liquidated under chapter 7 of the Bankruptcy Code.

**D.      Classification and Allowance of Claims and Interests Generally**

Section 1123 of the Bankruptcy Code provides that, except for administrative expense claims and priority tax claims, a plan of reorganization must categorize claims against and equity interests in a debtor into individual classes.  Although the Bankruptcy Code gives a plan

proponent significant flexibility in classifying claims and interests, section 1122 of the Bankruptcy Code dictates that a plan of reorganization may only place a claim or an equity interest into a class containing claims or equity interests that are substantially similar.

The Plan creates several "Classes" of Claims and Equity Interests. These Classes take into account the differing nature and priority of Claims against and Equity Interests in the Debtor. Administrative Claims, DIP Facility Claims and Priority Tax Claims are not classified for purposes of voting or receiving distributions under the Plan, but are treated separately as unclassified Claims.

A Claim or Equity Interest shall be deemed classified in a particular Class only to the extent that the Claim or Equity Interest qualifies within the description of that Class and shall be deemed classified in a different Class to the extent that any remainder of such Claim or Equity Interest qualifies within the description of such different Class. A Claim or Equity Interest is in a particular Class only to the extent that such Claim or Equity Interest is Allowed in that Class and has not been paid or otherwise settled prior to the Effective Date.

The Plan provides specific treatment for each Class of Claims or Equity Interests. Only holders of Allowed Claims in Classes 1, 2 and 3 will receive distributions under the Plan.

Unless otherwise provided in the Plan or the Confirmation Order, the treatment of any Claim or Equity Interest under the Plan will be in full satisfaction, settlement, release and discharge of, and in exchange for, such Claim or Equity Interest.

The categories of Claims and Equity Interests and their treatment listed below classify Claims and Equity Interests for all purposes, including voting, confirmation and distribution pursuant to the Plan, except as otherwise provided herein or in the Plan, and pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code.

**E.      Classification and Treatment of Unclassified Claims under the Plan**

Unclassified Claims are Unimpaired by the Plan. The following are the unclassified Claims: Administrative Claims, Fee Claims, DIP Facility Claims, and Priority Tax Claims.

**1.      *Administrative Claims***

Under the Plan, each holder of an Allowed Administrative Claim (other than an Administrative Claim that is a Fee Claim) as of the Effective Date shall receive, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, such Administrative Claim, (i) Cash in an amount equal to the amount of such Allowed Administrative Claim as soon as reasonably practicable after the later of (a) the Effective Date, if such Administrative Claim is Allowed as of the Effective Date or thirty (30) days after the date such Administrative Claim becomes an Allowed Administrative Claim, if such Administrative Claim is Disputed as of, or following, the Effective Date, and (b) the date such Allowed Administrative Claim becomes due and payable in the ordinary course of business in accordance with the terms, and subject to the conditions, of any agreements governing, instruments evidencing, or other documents relating to, the applicable transaction giving rise to such Allowed Administrative Claim, if such Allowed Administrative Claim is based on liabilities incurred by the Debtor in the ordinary course of its

business; or (ii) such other treatment as the Debtor and such holder (in consultation with the Prepetition SWK Secured Parties and the DIP Secured Parties) shall have agreed in writing.

### 2.    *Fee Claims*

Under the Plan, the Bankruptcy Court shall determine the Allowed amounts of Fee Claims after notice and a hearing in accordance with the procedures established by the Bankruptcy Code and any applicable orders of the Bankruptcy Court.  The Reorganized Debtor shall pay Fee Claims in Cash in the amount Allowed by the Bankruptcy Court.  All requests for compensation or reimbursement of Fee Claims shall be filed and served on the Reorganized Debtor, counsel to the Reorganized Debtor, the U.S. Trustee and such other entities who are designated by the Bankruptcy Rules, the Confirmation Order, or other order of the Court, no later than forty-five (45) days after the Effective Date, unless otherwise agreed by the Reorganized Debtor.  Holders of Fee Claims that are required to file and serve applications for final allowance of their Fee Claims that do not file and serve such applications by the required deadline shall be forever barred from asserting such Claims against the Debtor, Reorganized Debtor, or their respective assets, and such Fee Claims shall be deemed discharged as of the Effective Date. Objections to any Fee Claims must be filed and served on the Reorganized Debtor, counsel to the Reorganized Debtor, the U.S. Trustee and the requesting party no later than fourteen (14) days after the filing of the final applications for compensation or reimbursement (unless otherwise agreed by the party requesting compensation of a Fee Claim).

### 3.    *DIP Facility Claims*

Under the Plan, subject to the terms of the DIP Facility, in full and final satisfaction, settlement, release and discharge of and in exchange for release of all DIP Facility Claims, on the Effective Date, (i) the DIP Facility Claims shall be converted into obligations under the Exit Term Loan Facility, or (ii) such other treatment as the DIP Secured Parties and the Debtor have agreed in writing.

### 4.    *Priority Tax Claims*

Under the Plan, each holder of an Allowed Priority Tax Claim due and payable on or before the Effective Date shall receive, as determined by the Debtor (in consultation with the Prepetition SWK Secured Parties and the DIP Secured Parties), in full and final satisfaction, settlement, release, and discharge of, and in exchange for, such Priority Tax Claim (i) payment in full in Cash, payable in equal Cash installments made on a quarterly basis in accordance with section 1129(a)(9)(C) of the Bankruptcy Code, over a period not to exceed five (5) years following the Petition Date, plus statutory interest on any outstanding balance from the Effective Date, calculated at the prevailing rate under applicable nonbankruptcy law for each taxing authority and to the extent provided for by section 511 of the Bankruptcy Code, and in a manner not less favorable than the most favored nonpriority General Unsecured Claim provided for by the Plan (other than cash payments made to a class of creditors pursuant to section 1122(b) of the Bankruptcy Code); or (ii) such other treatment as may be agreed upon by such holder and the Debtor or otherwise determined upon a Final Order of the Court.

F.     **Classification and Treatment of Classified Claims and Equity Interests under the Plan**

The treatment of Claims against and Equity Interests in the Debtor is set forth in detail in the Plan.  A summary of that treatment is provided below.

Unless the holder of an Allowed Claim or Equity Interest and the Debtor agree to a different treatment, each holder of an Allowed Claim or Equity Interest will receive the following distributions in accordance with the Plan:

1.     *Class 1 – Prepetition SWK Claims*

Class 1 consists of Prepetition SWK Claims, which shall be Allowed in the aggregate of not less than $26,434,349 as of the Petition Date.

Except to the extent that the holders of the Prepetition SWK Claims and the Debtor agree in writing to less favorable treatment, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, the Allowed Prepetition SWK Claims, the Prepetition SWK Secured Parties shall receive their Pro Rata share of 100% of the New Stock in Reorganized ABT and the portion of the Exit Term Loan Note not attributable to the DIP Facility Claims distribution.

2.     *Class 2 – Other Priority Claims*

Class 2 consists of Other Priority Claims, which means a Claim entitled to priority pursuant to section 507(a) of the Bankruptcy Code, other than (i) an Administrative Claim, or (ii) a Priority Tax Claim.

Under the Plan, except to the extent that a holder of an Allowed Other Priority Claim and the Debtor (in consultation with the Prepetition SWK Secured Parties and the DIP Secured Parties) agree in writing to less favorable treatment, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Other Priority Claim, each holder of an Allowed Other Priority Claim shall receive (i) payment in Cash in an amount equal to such Allowed Other Priority Claim as soon as practicable after the later of (a) the Effective Date and (b) thirty (30) days after the date when such Other Priority Claim becomes an Allowed Other Priority Claim or (ii) such other treatment, as determined by the Debtor, that will render it Unimpaired pursuant to section 1124 of the Bankruptcy Code.

3.     *Class 3 – Other Secured Claims*

Class 3 consists of Other Secured Claims, which means any Claim that is Secured, other than the Prepetition SWK Claims and the DIP Facility Claims.

Under the Plan, except to the extent that a holder of an Allowed Other Secured Claim and the Debtor (in consultation with the Prepetition SWK Secured Parties and the DIP Secured Parties) agree in writing to less favorable treatment, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Other Secured Claim, each holder of an Allowed Other Secured Claim shall receive, at the option of the Reorganized Debtor, (i)

Cash in an amount equal to such Allowed Other Secured Claim, including any interest on such Allowed Other Secured Claim, if such interest is required to be paid pursuant to sections 506(b) or 1129(a)(9) of the Bankruptcy Code, as soon as practicable after the later of (a) the Effective Date, and (b) thirty (30) days after the date such Other Secured Claim becomes an Allowed Other Secured Claim, (ii) the Collateral securing its Allowed Other Secured Claim as soon as practicable after the later of (a) the Effective Date and (b) thirty (30) days after the date such Other Secured Claim becomes an Allowed Other Secured Claim, or (iii) such other treatment, as determined by the Debtor (or, if after the Effective Date, the Reorganized Debtor), that will render it Unimpaired pursuant to section 1124 of the Bankruptcy Code.

### 4.      *Class 4 – General Unsecured Claims*

Class 4 consists of General Unsecured Claims, which means any Claim that is not (i) Secured, (ii) a Subordinated Claim, or (iii) entitled to priority under the Bankruptcy Code or an order of the Court; General Unsecured Claims shall specifically include any Claim arising from the rejection of an Executory Contract or Unexpired Lease under section 365 of the Bankruptcy Code.

Under the Plan, Holders of Allowed General Unsecured Claims shall not receive any distributions under the Plan.

### 5.      *Class 5 – Subordinated Claims*

Class 5 consists of Subordinated Claims, which means  (i) all claims against the Debtor of the type described in section 510(b) of the Bankruptcy Code; (ii) and any Claim that is equitably subordinated to all general unsecured Claims pursuant to section 510(c) of the Bankruptcy Code; and (iii) any Claim against the Debtor, whether secured or unsecured, for any fine, penalty, forfeiture, attorneys' fees (to the extent that such attorneys' fees are punitive in nature), multiple, exemplary or punitive damages, or for any other amount that does not represent compensation for actual pecuniary loss suffered by the Holder of such Claim to the extent provided by applicable law.

Holders of Allowed Subordinated Claims shall not receive any distributions under the Plan.

### 6.      *Class 6–Equity Interests*

Class 6 consists of Equity Interests, which means any "equity security" (as such term is defined in section 101(16) of the Bankruptcy Code) in the Debtor, whether or not transferable, and any option or right, contractual or otherwise, to acquire any such interest in the Debtor (including any performance or incentive awards payable in equity) that existed immediately prior to the Effective Date.

Under the Plan, on the Effective Date, all Equity Interests shall be cancelled and discharged and shall be of no further force or effect, whether surrendered for cancellation or otherwise, and holders of Equity Interests shall not receive or retain any property under the Plan on account of such Equity Interests.

### G.       Corporate Governance of the Reorganized Debtor

#### 1.       *Organizational Documents*

On or immediately before the Effective Date, the Reorganized Debtor Organization Documents will be deemed to have been adopted and will become effective on the Effective Date.  The Reorganized Debtor Organization Documents shall prohibit the issuance of nonvoting equity securities only so long as, and to the extent that, the issuance of nonvoting equity securities is prohibited by the Bankruptcy Code.

#### 2.       *The Reorganized Debtor's Officers and Board of Directors*

As of the Effective Date, the term of the current board of directors of the Debtor shall expire without further action by any Person.  The board of directors of the Reorganized Debtor shall consist of the individuals identified in the Plan Supplement.

From and after the Effective Date, ABT's existing officers shall retain their offices unless otherwise provided for in the Plan Supplement.  The officers of the Reorganized Debtor shall have the power to enter into or execute any documents or agreements that they deem reasonable and appropriate to effectuate the terms of the Plan.

### H.       Means of Implementing the Plan

#### 1.       *Operations Between the Confirmation Date and Effective Date*

During the period from the Confirmation Date through and until the Effective Date, the Debtor may continue to operate its business as a debtor in possession, subject to all applicable orders of the Bankruptcy Court.

#### 2.       *Issuance of New Common Stock.*

(a)       Stock Issuance.  On the Effective Date: (i) the existing Equity Interests in the Debtor will be cancelled, extinguished and discharged; and (ii) the New Common Stock will be issued and, as soon as practicable thereafter, distributed, as provided for in Article III of the Plan and the Reorganized Debtor Organizational Documents.  The issuance by the Reorganized Debtor of the New Common Stock is authorized without the need for any further corporate action and without any further action by any holder of a Claim or Equity Interest.

(b)       Exemption from Registration. The offering, issuance, and distribution of the New Common Stock shall be exempt from the registration requirements of section 5 of the Securities Act under section 1145(a) of the Bankruptcy Code.

(c)       Reporting Requirements. On the Effective Date, none of the New Common Stock will be listed on a national securities exchange, the Reorganized Debtor will not be a reporting company under the Securities Exchange Act, the Reorganized Debtor shall not be required to and will not file reports with the Securities and Exchange Commission or any other entity or party, other than required reports in this Chapter 11 Case.

3.    *Continued Corporate Existence and Vesting of Assets.*

On the Effective Date, except as otherwise specifically provided for in the Plan, (i) the Reorganized Debtor will exist after the Effective Date as a legal entity, with all of the powers of such a legal entity under applicable law and without prejudice to any right to alter or terminate such existence (whether by merger, dissolution or otherwise) under applicable law; and (ii) on the Effective Date, all property of the Debtor's Estate, and any property acquired by the Debtor or Reorganized Debtor under the Plan, will vest in such Reorganized Debtor free and clear of all Claims, Liens, charges, other encumbrances, Equity Interests, and other interests, except for the Liens and Claims established under the Plan.

On and after the Effective Date, the Reorganized Debtor will operate its business and use, acquire, and dispose of property and compromise or settle any claims without supervision or approval by the Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules, subject only to those restrictions expressly imposed by the Plan or the Confirmation Order as well as the documents and instruments executed and delivered in connection therewith, including the documents, exhibits, instruments, and other materials comprising the Plan Supplement. Without limiting the foregoing, the Reorganized Debtor may pay the charges that it incurs from and after the Effective Date for fees, disbursements, expenses, or related support services (including fees relating to the preparation of Professional fee applications) without application to, or the approval of, the Court.

4.    *Preservation of Causes of Action.*

In accordance with section 1123(b) of the Bankruptcy Code, and except as expressly provided herein (including Articles III, IV and VII), the Reorganized Debtor shall retain all Causes of Action (including all Avoidance Actions). Nothing contained in this Plan or the Confirmation Order shall be deemed a waiver or relinquishment of any claim, Cause of Action, right of setoff, or other legal or equitable defense of the Debtor that is not specifically waived or relinquished by this Plan. The Reorganized Debtor shall have, retain, reserve, and be entitled to assert, all such claims, Causes of Action, Avoidance Actions, rights of setoff, and other legal or equitable defenses that the Debtor had immediately before the Petition Date as fully as if the Chapter 11 Case had not been commenced, and all of the Reorganized Debtor's legal and equitable rights respecting any claim that is not specifically waived or relinquished by this Plan may be asserted after the Effective Date to the same extent as if the Chapter 11 Case had not been commenced. No Person may rely on the absence of a specific reference in the Plan, Plan Supplement, or the Disclosure Statement to any Cause of Action against them as any indication that the Debtor or the Reorganized Debtor, as applicable, will not pursue any and all available Causes of Action or Avoidance Actions against such Person. The Debtor or the Reorganized Debtor, as applicable, expressly reserves all rights to prosecute any and all Causes of Action (including any Avoidance Action) against any Person, in accordance with the Plan. From and after the Effective Date, the Reorganized Debtor shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any Cause of Action (including any Avoidance Action) and to decline to do any of the foregoing without further notice to or action, order, or approval of the Court. The Reorganized Debtor is deemed a representative of the Estate for the purpose of prosecuting any Claim or Cause of Action and any objections to Claims pursuant to section 1123(b)(3)(B) of the Bankruptcy Code.

5.      *Corporate Action.*

Each of the matters provided for by the Plan involving the corporate structure of the Debtor or corporate or related actions to be taken by or required of the Reorganized Debtor, whether taken prior to or as of the Effective Date, shall be deemed authorized and approved in all respects without the need for any further corporate action and without any further action by the Debtor or the Reorganized Debtor, as applicable.

I.      **Claims Objections and Distributions On Account of Allowed Claims**

One of the key concepts under the Bankruptcy Code is that only Claims that are "allowed" may receive distributions under a Chapter 11 plan.  This term is used throughout the Plan and the descriptions below.  In general, an "allowed" Claim simply means that the Debtor agrees, or in the event of a dispute, that the Bankruptcy Court determines, that the Claim, and the amount thereof, is in fact a valid obligation of the Debtor.

1.      *Objections to Claims.*

After the Effective Date, the Reorganized Debtor shall have and shall retain any and all rights and defenses either it or the Debtor may have with respect to any Claim, and shall have the exclusive authority to file objections and to settle, compromise, withdraw or litigate to judgment objections to Claims (except those Allowed by, or released by, the Plan, the Confirmation Order or other Final Order).  The Reorganized Debtor shall file objections to any Disputed Claims in accordance with the Bankruptcy Rules on or before the Claims Objection Deadline, as the same may be extended pursuant to the terms of the Plan or order of the Bankruptcy Court.

2.      **Claim Amendments**.

After the Confirmation Date, a Claim may not be filed or amended without the authorization of the Bankruptcy Court and, even with such Bankruptcy Court authorization, may be amended by the holder of such Claim, unless otherwise provided by the Bankruptcy Court, solely to decrease, but not to increase the amount, number or priority of the Claim to be amended.

3.      **Delivery of Distributions in General**.

Except as otherwise provided herein, distributions under the Plan shall be made by the Reorganized Debtor to the holders of Allowed Claims in all Classes for which a distribution is provided in the Plan at the addresses set forth on the Schedules (if filed) or in the Debtor's books and records, as applicable, unless such addresses are superseded by proofs of Claim or transfers of Claim filed pursuant to Bankruptcy Rule 3001 by the Record Date (or at the last known addresses of such holders if the Debtor or the Reorganized Debtor has been notified in writing of a change of address).

4.      **Distribution of Cash.**

Any payment of Cash by the Reorganized Debtor pursuant to the Plan shall be made in U.S. dollars and at the option and in the sole discretion of the Reorganized Debtor by (i) a check drawn on, or (ii) wire transfer from, a bank selected by the Reorganized Debtor.

5.      **No Fractional or De Minimis Distributions.**

Notwithstanding anything contained herein to the contrary, payments of fractional dollars will not be made. Whenever any payment of a fraction of a dollar under the Plan would otherwise be called for, the actual payment made will reflect a rounding down of such fractions. The Reorganized Debtor shall not be required to make any payment of less than $20.00 on any distribution.

6.      **Saturdays, Sundays, or Legal Holidays.**

If any payment, distribution or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, and shall be deemed to have been completed as of the required date.

7.      **Distributions to Holders of Claims.**

(a)     Initial Distribution to Claims Allowed as of the Effective Date. On or as soon as reasonably practicable after the Effective Date, or as otherwise expressly set forth in the Plan, the Reorganized Debtor shall distribute Cash or Collateral, as the case may be, to the holders of Allowed Claims as contemplated in the Plan.

(b)     Claims Allowed after the Effective Date. Each holder of a Claim that becomes an Allowed Claim subsequent to the Effective Date shall receive the distribution to which such holder of an Allowed Claim is entitled as set forth in Articles II and III, and distributions to such holder shall be made in accordance with the provisions of the Plan. As soon as practicable after the date that the Claim becomes an Allowed Claim, the Reorganized Debtor shall provide to the holder of such Claim the distribution (if any) to which such holder is entitled under the Plan as of the Effective Date, without any interest to be paid on account of such Claim.

8.      **Undeliverable Distributions**

(a)     Holding of Undeliverable Distributions. If any distribution to a holder of an Allowed Claim is returned to the Reorganized Debtor as undeliverable, no further distributions shall be made to such holder unless and until the Reorganized Debtor is notified in writing of such holder's then-current address or other necessary information for delivery, at which time all currently due missed distributions shall be made to such holder as soon as practicable. Undeliverable distributions shall remain in the possession of the Reorganized Debtor until such time as a distribution becomes deliverable, and shall not be supplemented with any interest, dividends or other accruals of any kind.

(b)     Failure to Claim Undeliverable Distributions.  Any holder of an Allowed Claim that does not provide the necessary information (as set forth in subsection (a) of this Section) for an Undeliverable distribution within one hundred eighty (180) days after the distribution is distributed shall be deemed to have waived its Claim for such undeliverable distribution and shall be forever barred from asserting any such Claim against the Reorganized Debtor or its property.  In such cases, notwithstanding any applicable federal or state escheat, abandoned or unclaimed property laws to the contrary, any Cash held for distribution on account of such undeliverable distribution shall be property of the Reorganized Debtor, free of any restrictions thereon.  Nothing contained in the Plan shall require the Debtor, the Reorganized Debtor, or a distribution agent to attempt to locate any holder of an Allowed Claim.

**9.      Compliance with Tax Requirements**

In connection with the Plan, to the extent applicable, the Debtor or the Reorganized Debtor, as applicable, shall comply with all tax withholding, payment and information reporting requirements imposed on it by any Governmental Unit, and all distributions pursuant to the Plan shall be subject to such withholding, payment and information reporting requirement.  The Reorganized Debtor shall withhold all amounts required by law to be withheld from payments made under the Plan. Any amounts so withheld from any payment made under the Plan shall be deemed paid to the holder of the Allowed Claim subject to withholding.  Notwithstanding the above, each holder of an Allowed Claim that is to receive a distribution under the Plan shall have the sole and exclusive responsibility for the satisfaction and payment of any taxes imposed on such holder by any Governmental Unit on account of such distribution, including income withholding, and other tax obligations, on account of such distribution.  The Reorganized Debtor has the right, but not the obligation, not to make a distribution until such holder has made arrangements satisfactory to the Reorganized Debtor or any disbursing agent for payment and satisfaction of any withholding tax obligations.  If the Reorganized Debtor fails to withhold with respect to any such holder's distribution, and is later held liable for the amount of such withholding, the holder shall reimburse the Reorganized Debtor.  Notwithstanding any provision in this Plan to the contrary, the Debtor, Reorganized Debtor or any distribution agent shall be authorized to take all actions necessary or appropriate to comply with such withholding, payment, and information reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions and determine any withholding thereon, or establishing any other mechanisms they believe are reasonable and appropriate.  The Debtor, Reorganized Debtor or any distribution agent may require, as a condition to the receipt of a distribution, that the holder complete the appropriate Internal Revenue Service Form W-8 or Form W-9, as applicable to each holder.  If the holder fails to comply with such a request within one hundred eighty (180) days, such distribution shall be deemed an undeliverable distribution.  Finally, the Debtor or the Reorganized Debtor, as applicable, or a distribution agent reserves the right to allocate all distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support, and other spousal awards, Liens, and encumbrances.

10.      **Time Bar to Cash Payments.**

Checks issued on account of Allowed Claims shall be null and void if not negotiated within one hundred eighty (180) days after the date of issuance therein.  Requests for reissuance of any check shall be made in writing directly to the Reorganized Debtor by the holder of the Allowed Claim with respect to which such check originally was issued.  Any Claim in respect of such a voided check shall be made in writing on or before the later of one hundred eighty (180) days after the Effective Date or ninety (90) days after the date of issuance of such check.  After such date, all Claims in respect of void checks shall be discharged and forever barred and the distribution on account of such Claims shall be treated in accordance with Article VIII of the Plan.

11.      **Foreign Currency Exchange Rates.**

Any of the Effective Date, any Claim asserted in currency(ies) other than U.S. dollars shall be automatically deemed converted, as of the Effective Date, to the equivalent U.S. dollar value using the mid-range spot rate of exchange for the applicable currency as published in The Wall Street Journal, National Edition, the day after the Petition Date.

12.      **Setoffs.**

Except as otherwise provided herein, a Final Order of the Bankruptcy Court, or as agreed to by the holder of a Claim and the Debtor or Reorganized Debtor, as applicable, the Reorganized Debtor may, pursuant to section 553 of the Bankruptcy Code and applicable nonbankruptcy law, set off against any Allowed Claim and the distributions to be made pursuant to the Plan on account of such Claim (before any distribution is made on account of such Claim), the claims, rights and Causes of Action of any nature that the Debtor or the Reorganized Debtor, as applicable, may hold against the holder of such Allowed Claim; provided, however, that neither the failure to effect such a setoff nor the allowance of any Claim hereunder shall constitute a waiver or release of any such claims, rights and Causes of Action that the Debtor or the Reorganized Debtor may possess against such holder.

13.      **Claims Paid or Payable by Third Parties.**

A Claim shall be reduced in full and such Claim shall be disallowed without a Claims objection having to be filed and without any further notice to, or action, order or approval of, the Bankruptcy Court, to the extent that the holder of such Claim receives payment in full on account of such Claim from a party that is not the Debtor or Reorganized Debtor.  To the extent a holder of a Claim receives a distribution on account of such Claim and receives payment from a party that is not the Debtor or Reorganized Debtor, such holder shall repay, return or deliver any distribution held by or transferred to the holder to the Reorganized Debtor to the extent the holder's total recovery on account of such Claim from the third party and under the Plan exceeds the total amount of such Claim

14.      **Special Rules for Distributions to Holders of Disputed Claims.**

Notwithstanding any provision otherwise in the Plan and except as otherwise agreed to by the relevant parties, no partial payments or partial distributions shall be made with respect to a

Disputed Claim until all such disputes in connection with such Disputed Claim, respectively, have been resolved by settlement or Final Order.  In the event that there are Disputed Claims requiring adjudication and resolution, the Reorganized Debtor shall establish appropriate reserves for potential payment of such Claims.

### 15.    Interest on Claims.

Except as specifically provided for in the Plan, no Claims, Allowed or otherwise (including Administrative Claims), shall be entitled, under any circumstances, to receive any interest on a Claim.

### 16.    Allocation of Consideration.

The aggregate consideration to be distributed to the holders of Allowed Claims in each Class under the Plan shall be treated as first satisfying an amount equal to the principal amount (as determined under U.S. federal income tax principles) of the Allowed Claim for such holders, and any remaining consideration as satisfying accrued, but unpaid interest, as applicable.

### 17.    Estimation.

Prior to or after the Effective Date, the Debtor or the Reorganized Debtor, as applicable, may (but are not required to), at any time, request that the Court estimate (i) any Disputed Claim pursuant to section 502(c) of the Bankruptcy Code or (ii) any contingent or unliquidated Claim pursuant to section 502(c) of the Bankruptcy Code, for any reason, regardless of whether the Debtor or the Reorganized Debtor has previously objected to such Claim or whether the Court has ruled on any such objection.  The Court will retain jurisdiction to estimate any Claim at any time, including during proceedings concerning any objection to such Claim.  In the event that the Court estimates any Claim, such estimated amount shall constitute either (i) the Allowed amount of such Claim, (ii) the amount on which a reserve is to be calculated for purposes of any reserve requirement under the Plan or (iii) a maximum limitation on such Claim, as determined by the Court.  If the estimated amount constitutes the maximum limitation on such Claim, the Debtor or the Reorganized Debtor, as the case may be, may elect to object to any ultimate allowance of such Claim.  All of the aforementioned objection, estimation, and resolution procedures are cumulative and not necessarily exclusive of one another.

### 18.    Insured Claims.

If any portion of an Allowed Claim is an insured Claim, no distributions under the Plan shall be made on account of such Allowed Claim until the holder of such Allowed Claim has exhausted all remedies with respect to any applicable insurance policies.  To the extent that the Debtor's insurers agree to satisfy a Claim in whole or in part, then immediately upon such agreement, the portion of such Claim so satisfied may be expunged without an objection to such Claim having to be filed and without any further notice to or action, order or approval of the Court.

**J.       Executory Contracts and Unexpired Leases**

     **1.       *Assumption and Rejection of Executory Contracts and Unexpired Leases.***

     Subject to the provisions herein, each of the Executory Contracts and Unexpired Leases shall be deemed assumed as of the Effective Date unless such Executory Contract or Unexpired Lease: (1) was assumed or rejected previously by the Debtor; (2) is identified on the Rejected Contract Schedule, which list shall be included in the Plan Supplement; (3) is the subject of a separate motion or notice to reject filed by the Debtor on or before the filing of the Rejected Contract Schedule; or (4) previously expired or terminated pursuant to its own terms.

     Entry of the Confirmation Order by the Bankruptcy Court shall constitute an order approving the assumptions or rejections of such Executory Contracts and Unexpired Leases as set forth in the Plan, all pursuant to sections 365(a) and 1123 of the Bankruptcy Code.  Unless otherwise indicated, all assumptions or rejections of such Executory Contracts and Unexpired Leases in the Plan are effective as of the Effective Date.  Each such Executory Contract and Unexpired Lease assumed pursuant to the Plan or by Bankruptcy Court order, and not assigned to a third party prior to the Effective Date, shall revest in and be fully enforceable by the Reorganized Debtor in accordance with its terms, except as such terms may have been modified by order of the Bankruptcy Court.  To the extent any provision in any Executory Contract and/or Unexpired Lease assumed pursuant to the Plan (including, without limitation, any "change of control" provision) restricts or prevents, or purports to restrict or prevent, or is breached or deemed breached by, the Debtor or Reorganized Debtor's assumption or assignment of such assumed contract, then such provision shall be deemed modified such that the transactions contemplated by the Plan shall not entitle the non-debtor party thereto to terminate such executory contract or unexpired lease or to exercise any other default-related rights with respect thereto.  Further, any provisions in any Executory Contract or Unexpired Lease or under non-bankruptcy law providing for the termination or modification of any Executory Contract or Unexpired Lease by reason of the commencement of the Chapter 11 Case, the financial condition of any of the Debtor or the assignment of any Executory Contract or Unexpired Lease shall be unenforceable pursuant to Sections 365(e) and (f) and 541(c) of the Bankruptcy Code.  Notwithstanding anything to the contrary in the Plan, the Debtor or Reorganized Debtor, as applicable, reserve the right to alter, amend, modify or supplement the Rejected Contract Schedule prior to the Confirmation Date.

     **2.       *Cure of Defaults for Assumed Executory Contracts and Unexpired Leases.***

     Any provisions or terms of the Executory Contracts or Unexpired Leases to be assumed pursuant to the Plan that are, or may be, alleged to be in default, shall be satisfied solely by Cure or by an agreed-upon waiver of Cure.  As part of the Plan Supplement, the Debtor shall File the Cure Schedule, which schedule shall identify the Executory Contracts and Unexpired Leases to be assumed by the Debtor pursuant to the Plan and shall include any amounts of Cure to be paid in connection therewith.  Any objection by a counterparty to an Executory Contract or Unexpired Lease to a proposed assumption or related Cure amount must be Filed, served and actually received by the Debtor not later than seven (7) days after service of the notices of proposed assumption of specified contracts.  Any counterparty to an Executory Contract or Unexpired Lease that fails to object timely to the proposed assumption or Cure amount will be deemed to

have assented to, and will forever be barred from contesting, such assumption or Cure amount. The Reorganized Debtor also may settle any Cure without further notice to or action, order, or approval of the Bankruptcy Court.

If any counterparty to an Executory Contract of Unexpired Lease objects to any Cure amount or any other matter related to assumption, the Bankruptcy Court shall determine the Allowed amount of such Cure and any related issues. If there is a dispute regarding such Cure, the ability of the applicable Reorganized Debtor or any assignee to provide "adequate assurance of future performance" within the meaning of section 365 of the Bankruptcy Code, or any other matter pertaining to assumption, then Cure shall occur as soon as reasonably practicable after entry of a Final Order resolving such dispute, approving such assumption (and, if applicable, assignment), or as may be agreed upon by the applicable Debtor or Reorganized Debtor, and the counterparty to the Executory Contract or Unexpired Lease. Any counterparty to an Executory Contract or Unexpired Lease that fails to object timely to the proposed assumption of any Executory Contract or Unexpired Lease will be deemed to have consented to such assumption. The Debtor or Reorganized Debtor, as applicable, reserve the right, either to reject or nullify the assumption of any Executory Contract or Unexpired Lease no later than thirty days after a Final Order determining the Cure or any request for adequate assurance of future performance required to assume such Executory Contract or Unexpired Lease.

Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time prior to the effective date of assumption.

ASSUMPTION OF ANY EXECUTORY CONTRACT OR UNEXPIRED LEASE PURSUANT TO THE PLAN OR OTHERWISE SHALL RESULT IN THE FULL RELEASE AND SATISFACTION OF ANY CLAIMS OR DEFAULTS, WHETHER MONETARY OR NONMONETARY, INCLUDING DEFAULTS OF PROVISIONS RESTRICTING THE CHANGE IN CONTROL OR OWNERSHIP INTEREST COMPOSITION OR OTHER BANKRUPTCY-RELATED DEFAULTS, ARISING UNDER ANY ASSUMED EXECUTORY CONTRACT OR UNEXPIRED LEASE AT ANY TIME BEFORE THE DATE THAT EITHER THE DEBTOR OR THE REORGANIZED DEBTOR ASSUMES SUCH EXECUTORY CONTRACT OR UNEXPIRED LEASE. ANY PROOFS OF CLAIM FILED WITH RESPECT TO AN EXECUTORY CONTRACT OR UNEXPIRED LEASE THAT HAS BEEN ASSUMED SHALL BE DEEMED DISALLOWED AND EXPUNGED, WITHOUT FURTHER NOTICE TO OR ACTION, ORDER OR APPROVAL OF THE COURT.

3.      *Reservation of Rights.*

Nothing contained in the Plan shall constitute an admission by the Debtor that any contract or lease is in fact an Executory Contract or Unexpired Lease or that the Reorganized Debtor has any liability thereunder. If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption, the Debtor or the Reorganized Debtor, as applicable, shall have 45 days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease, in which case the deemed assumptions and rejections provided for in the Plan shall not apply to such contract or lease.

4.    *Insurance Policies.*

Notwithstanding anything in the Plan to the contrary, all of the Debtor's insurance policies and any agreements, documents or instruments relating thereto, are treated as and deemed to be Executory Contracts under the Plan.  On the Effective Date, the Debtor shall be deemed to have assumed (and assigned, if necessary) all insurance policies and any agreements, documents, and instruments related thereto.  Obligations arising under insurance policies assumed by the Debtor before the Effective Date shall be adequately protected in accordance with any order authorizing such assumption.

5.    *Employee Compensation and Benefits Programs*

Subject to the provisions of the Plan, with respect to any employees and officers of the Debtor employed following the Effective Date, except to the extent (i) otherwise provided for in the Plan, (ii) previously assumed or rejected by an order of the Bankruptcy Court entered on or before the Confirmation Date, (iii) the subject of a pending motion to reject filed by the Debtor on or before the Confirmation Date, or (iv) previously terminated, all employee compensation and benefit programs of the Debtor in effect during the pendency of the Chapter 11 Cases, including all health and welfare plans, 401(k) plans, pension plans within the meaning of Title IV of the Employee Retirement Income Security Act of 1974, as amended, all benefits subject to sections 1114 and 1129(a)(13) of the Bankruptcy Code, shall be deemed to be, and shall be treated as though they are, Executory Contracts that are assumed and assigned pursuant to section 365 of the Bankruptcy Code and Article X of the Plan. Nothing contained herein shall be deemed to modify the existing terms of such employee compensation and benefit programs, including, without limitation, the Debtor's and the Reorganized Debtor's rights of termination and amendment thereunder.

As of the Effective Date, any and all stock based incentive plans or stock ownership plans of the Debtor entered into before the Effective Date, or other agreements or documents giving rise to Equity Interests, including the contingent cash components of any such plans, agreements, or documents, shall be terminated. To the extent such plans, agreements, or documents are considered to be Executory Contracts, such plans, agreements, or documents shall be deemed to be, and shall be treated as though they are, Executory Contracts that are rejected pursuant to section 365 of the Bankruptcy Code under the Plan. Any Claims resulting from such rejection shall constitute Equity Interests. From and after the Effective Date, stock options, whether included in a contract, agreement or otherwise, will have no value and will not entitle any Holder thereof to purchase or otherwise acquire any equity interests in any of the Reorganized Debtor.

6.    *Post-Petition Contracts and Leases.*

All contracts, agreements, and leases that were entered into by the Debtor or assumed by the Debtor after the Petition Date shall be deemed assigned to the Reorganized Debtor on the Effective Date to the extent necessary.

## VII.    DISCHARGES, RELEASES AND INJUNCTIONS

### A.    General Settlement of Claims and Interests.

The entry of the Confirmation Order shall constitute the Court's approval of each of the compromises and settlements embodied in the Plan, and the Court's findings shall constitute its determination that such compromises and settlements are in the best interests of the Debtor, its Estate, creditors, and other parties-in-interest, and are fair, equitable, and within the range of reasonableness.  The Plan and the Confirmation Order shall have res judicata, collateral estoppel, and estoppel (judicial, equitable, or otherwise) effect with respect to all matters provided for, or resolved pursuant to, the Plan or the Confirmation Order, including the release, injunction, exculpation, discharge, and compromise provisions contained in the Plan or the Confirmation Order.  The provisions of the Plan, including its release, injunction, exculpation and compromise provisions, are mutually dependent and non-severable.

### B.    Subordination of Claims.

The allowance, classification and treatment of all Allowed Claims and Equity Interests and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Equity Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto.  However, the Debtor reserves the right to reclassify any Allowed Claim or Equity Interest in accordance with any contractual, legal or equitable subordination relating thereto, unless otherwise provided in a settlement agreement concerning such Allowed Claim.

### C.    Discharge of the Debtor.

**Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan or in any contract, instrument, or other agreement or document created pursuant to the Plan: (a) the distributions, rights, and treatment that are provided in the Plan shall be in complete satisfaction, discharge, and release of all Claims, Equity Interests, and Causes of Action of any nature whatsoever, whether known or unknown, against the Debtor or any of its assets, property, or Estate (including any interest accrued on Claims or Equity Interests from and after the Petition Date) and liabilities of, Liens on, obligations of, rights against and Equity Interests in, whether known or unknown, the Debtor, the Reorganized Debtor or any of their assets, properties or Estate, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims, Equity Interests and Causes of Action, including demands, liabilities and Causes of Action that arose before the Effective Date, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date; (b) the Plan shall bind all holders of Claims and Equity Interests, notwithstanding whether any such holders failed to vote to accept or reject the Plan, voted to reject the Plan, or were deemed to reject the Plan; (c) all Claims and Equity Interests shall be satisfied, discharged and released in full, and the Debtor's liability with respect thereto, shall be extinguished completely, including debts of the kind specified in sections 502(g), 502(h) or 502(i) of the Bankruptcy Code, in each case whether or not: (i) a proof of Claim or Equity Interest based upon such debt, right, or Equity Interest is filed or deemed**

filed pursuant to section 501 of the Bankruptcy Code; (ii) a Claim or Equity Interest based upon such debt, right or Equity Interest is Allowed; or (iii) the holder of such a Claim or Equity Interest has accepted the Plan or is entitled to receive a distribution hereunder; and (d) all Entities shall be precluded from ever asserting against the Debtor, the Debtor's Estate, the Reorganized Debtor, their successors and assigns, and their assets and properties any Claims and Equity Interests based upon any documents, instruments, or any act or omission, transaction, or other activity of any kind or nature that occurred prior to the Effective Date.  Any default by the Debtor with respect to any Claim or Equity Interest that existed immediately before or on account of the filing of the Chapter 11 Case shall be deemed cured on the Effective Date.  The Confirmation Order shall be a judicial determination of the discharge of all Claims and Equity Interests subject to the Effective Date occurring.

D.    **Release of Liens.**

Except as otherwise expressly provided in the Plan, or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan, all mortgages, deeds of trust, Liens, pledges, and other security interests against any property of the Debtor's Estate shall be fully released and discharged, and all of the right, title, and interest of any holder of such mortgages, deeds of trust, Liens, pledges, and other security interests shall revert to the Reorganized Debtor and its successors and assigns.

E.    **Releases by the Debtor.**

Except as otherwise specifically provided in the Plan, for good and valuable consideration, including the service of the Released Parties[3] to facilitate the reorganization of the Debtor, the implementation of the restructuring contemplated by the Plan and the compromises contained herein, on and after the Effective Date, the Released Parties are hereby released and discharged by the Debtor, the Reorganized Debtor and the Estate, including any successor to the Debtor or any Estate representative from all claims, obligations, rights, suits, damages, Causes of Action (including Avoidance Actions), remedies and liabilities whatsoever, including any derivative claims asserted or assertable on behalf of the Debtor, whether known or unknown, foreseen or unforeseen, liquidated or unliquidated, contingent or fixed, existing or hereafter arising, in law, at equity or otherwise, whether for indemnification, tort, contract, violations of federal or state securities laws or otherwise, including those that the Debtor, the Reorganized Debtor or the Estate would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Equity Interest or any other Person, based on or relating to, or in any manner arising from, in whole or in part, the Debtor and its Estate, the conduct of the business of the Debtor, the Chapter 11 Case, the purchase, sale or rescission of the purchase or sale of any security of the Debtor or the Reorganized

---

[3]    The Plan defines Released Parties to mean the Debtor, the Reorganized Debtor, the Prepetition SWK Secured Parties, the DIP Secured Parties, and all of their respective current and former officers, directors, members, employees, affiliates, parents, advisors, attorneys, professionals, accountants, investment bankers, consultants, agents, predecessors, or other representatives in their capacities as such (including their respective officers, directors, employees, members and professionals). Plan § I.A.67.

Debtor, the subject matter of, or the transactions or events giving rise to, any Claim or Equity Interest that is treated in the Plan, the restructuring of Claims and Equity Interests prior to or during the Chapter 11 Case, the negotiation, formulation or preparation of the Plan, the Plan Supplement, the Disclosure Statement or, in each case, related agreements, instruments or other documents, any action or omission as an officer, manager, member, representative, fiduciary, controlling person, affiliate or responsible party, any Restructuring-Related Action,[4] or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date of the Plan, <u>other than</u> claims or liabilities arising out of or relating to any act or omission of a Released Party to the extent such act or omission is determined by a Final Order to have constituted willful misconduct, gross negligence, bad faith, fraud or a criminal act.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the release set forth in Plan Section VII.E, which includes by reference each of the related provisions and definitions contained herein, and further, shall constitute the Bankruptcy Court's finding that such release is: (a) in exchange for the good and valuable consideration provided by the Released Parties; (b) a good faith settlement and compromise of the claims released by Plan Section VII.E; (c) in the best interests of the Debtor and its Estate; (d) fair, equitable, and reasonable; (e) given and made after due notice and opportunity for hearing; and (f) a bar to any Entity granting a release under Plan Section VII.E from asserting any claim or Cause of Action released by Plan Section VII.E.

F.    Exculpation.

Notwithstanding anything herein to the contrary and to the extent permitted by applicable law, the Exculpated Parties[5] shall neither have nor incur any liability to any Entity for any Restructuring-Related Action provided that nothing in the foregoing "Exculpation" shall exculpate any Entity from any liability resulting from any act or omission that is determined by Final Order to have constituted fraud, willful misconduct,

---

[4]    The Plan defines Restructuring-Related Action to mean any act taken or omitted to be taken in connection with, or arising from or relating in any way to, the restructuring of the Debtor or the Chapter 11 Case, including but not limited to, (a) the management and operation of the Debtor's business and the discharge of any duties under the Bankruptcy Code during the pendency of the Chapter 11 Case; (b) implementation of any of the transactions provided for, or contemplated in, this Plan or the Plan Supplement; (c) any action taken in the negotiation, formulation, development, proposal, solicitation, disclosure, Confirmation, or implementation of the Plan or Plan Supplement; (d) formulating, negotiating, preparing, disseminating, implementing, administering, confirming or effecting the necessary documentation of the Disclosure Statement and the Plan, the Plan Supplement, and any related contract, instrument, release or other agreement or document created or entered into in connection therewith (including the solicitation of votes for the Plan and other actions taken in furtherance of confirmation and consummation of the Plan); (f) the administration of this Plan or the assets and property to be distributed pursuant to this Plan; (g) any other prepetition or postpetition act taken or omitted to be taken in connection with or in contemplation of the bankruptcy restructuring of the Debtor; and (h) the preparation and filing of the Chapter 11 Case and the Schedules. Plan, § I.A.73.

[5]    The Plan defines Exculpated Parties to mean the Debtor and all of its current and former officers, directors, members, affiliates, employees, advisors, attorneys, professionals, accountants, investment bankers, consultants, agents, or successors (including their respective officers, directors, employees, members and professionals), solely in such capacities. Plan, § I.A.38.

gross negligence, or criminal conduct; provided that each Exculpated Party shall be entitled to rely upon the advice of counsel concerning his, her or its duties pursuant to, or in connection with, the Plan or any other related document, instrument, or agreement.

Notwithstanding anything herein to the contrary, as of the Effective Date, pursuant to section 1125(e) of the Bankruptcy Code, the Solicitation Parties upon appropriate findings of the Bankruptcy Court will be deemed to have solicited acceptance of the Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code, and to have participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code, in the offer, issuance, sale, or purchase of a security, offered or sold under the Plan of a Reorganized Debtor, and shall not be liable to any Entity on account of such solicitation or participation.

In addition to the protections afforded in Plan Article VII.F to the Exculpated Parties, and not in any way reducing or limiting the application of such protections, the Bankruptcy Court retains exclusive jurisdiction over any and all Causes of Action asserted against any Debtor for any Restructuring-Related Action that are not otherwise exculpated or enjoined by the Plan.

G.    **Injunction.**

EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THE PLAN, THE PLAN SUPPLEMENT OR RELATED DOCUMENTS, OR FOR OBLIGATIONS ISSUED PURSUANT TO THE PLAN, ALL PERSONS WHO HAVE HELD, HOLD, OR MAY HOLD LIENS, CLAIMS OR EQUITY INTERESTS THAT HAVE BEEN RELEASED OR DISCHARGED PURSUANT TO THIS PLAN OR ARE SUBJECT TO EXCULPATION PURSUANT TO THIS ARTICLE VII ARE PERMANENTLY ENJOINED, FROM AND AFTER THE EFFECTIVE DATE, FROM TAKING ANY OF THE FOLLOWING ACTIONS AGAINST, AS APPLICABLE, THE DEBTOR, THE REORGANIZED DEBTOR, THE RELEASED PARTIES, OR THE EXCULPATED PARTIES: (1) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH LIENS, CLAIMS, CAUSES OF ACTION, OR EQUITY INTERESTS; (2) ENFORCING, ATTACHING, COLLECTING, OR RECOVERING BY ANY MANNER OR MEANS ANY JUDGMENT, AWARD, DECREE, OR ORDER AGAINST SUCH RELEASED PARTIES OR EXCULPATED PARTIES ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH LIENS, CLAIMS, CAUSES OF ACTION, OR EQUITY INTERESTS; (3) CREATING, PERFECTING, OR ENFORCING ANY ENCUMBRANCE OF ANY KIND AGAINST SUCH RELEASED PARTIES OR EXCULPATED PARTIES OR AGAINST THE PROPERTY OR ESTATE OF SUCH RELEASED PARTIES OR EXCULPATED PARTIES ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS, CAUSES OF ACTION, OR EQUITY INTERESTS; (4) ASSERTING ANY RIGHT OF SETOFF, SUBROGATION, OR RECOUPMENT OF ANY KIND AGAINST ANY OBLIGATION DUE FROM THE DEBTOR OR REORGANIZED DEBTOR OR AGAINST THE PROPERTY OR INTERESTS IN PROPERTY OF THE DEBTOR OR REORGANIZED DEBTOR ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS, CAUSES OF ACTION, OR EQUITY INTERESTS; AND (5) COMMENCING OR CONTINUING IN ANY MANNER ANY

ACTION OR OTHER PROCEEDING OF ANY KIND ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH LIENS, CLAIMS, CAUSES OF ACTION, OR EQUITY INTERESTS RELEASED, SETTLED, OR DISCHARGED PURSUANT TO THE PLAN OR CONFIRMATION ORDER.  ANY ACTION TAKEN IN CONTRAVENTION OF THIS INJUNCTION SHALL BE DEEMED NULL AND VOID.

**H.      Limitations on Exculpations and Releases**

Notwithstanding anything contained  in the Plan to the contrary, the releases and exculpation contained in the Plan do not release any obligations of any party arising under the Plan or any document,  instrument or agreement (including those set forth in the documents related to the Plan Supplement) executed to implement the Plan.

**I.      Preservation of Insurance.**

The Debtor's discharge, exculpation and release, and the exculpation and release in favor of the Exculpated Parties, as provided herein, shall not, except as necessary to be consistent with the Plan, diminish or impair the enforceability of any insurance policy that may provide coverage for claims against the Debtor, the Reorganized Debtor and their current and former directors and officers, or any other Person.

**VIII.   CONDITIONS PRECEDENT TO CONFIRMATION AND CONSUMMATION OF THE PLAN**

**A.      Conditions Precedent to Effectiveness**

The Plan shall not become effective unless and until the Confirmation Date has occurred and the following conditions have been satisfied in full or waived in accordance with Plan Article XI.B:

(i)      the Confirmation Order entered by the Court shall be in form and substance reasonably satisfactory to the Debtor, the Prepetition SWK Secured Parties, and the DIP Secured Parties and consistent with the Plan;

(ii)      the Confirmation Order shall not have been stayed, modified, or vacated on appeal;

(iii)      all definitive documents shall be in form and substance reasonably satisfactory to the Debtor, the Prepetition SWK Secured Parties, and the DIP Secured Parties;

(iv)      all actions, documents, certificates, and agreements necessary to implement the Plan shall have been effected or executed and delivered to the required parties and, to the extent required, filed with the applicable Governmental Units in accordance with applicable laws;

(v)      all authorizations, consents, and regulatory approvals required (if any) for the Plan's effectiveness shall have been obtained;

(vi)      the Debtor shall have filed a notice of Effective Date with the Court.

**B.        Effective Date of the Plan**

The Plan shall become effective on the Effective Date.

**C.        Waiver of Conditions Precedent to the Effective Date**

The Debtor (in consultation with the Prepetition SWK Secured Parties and the DIP Secured Parties) may waive conditions set forth in Plan Article XI.A at any time without leave of or order of the Court and without any formal action.

**D.        Effect of Failure of Conditions**

Unless extended by agreement of the Debtor, the Prepetition SWK Secured Parties, and the DIP Secured Parties, in the event that the Effective Date does not occur on or before October 15, 2018: (i) the Confirmation Order may be vacated, (ii) no distributions under the Plan shall be made; (iii) the Debtor and all holders of Claims and Equity Interests shall be restored to the status quo ante as of the day immediately preceding the Confirmation Date as though the Confirmation Date had never occurred; and (iv) the Debtor's obligations with respect to the Claims and Equity Interests shall remain unchanged and nothing contained in the Plan shall constitute or be deemed a waiver, release, or discharge of any Claims or Equity Interests by or against the Debtor or any other person or to prejudice in any manner the rights of the Debtor or any person in any further proceedings involving the Debtor.

**E.        Modification of Plan**

Subject to the limitations contained in the Plan, (i) the Debtor reserves the right, in accordance with the Bankruptcy Code and the Bankruptcy Rules, to amend or modify the Plan prior to the entry of the Confirmation Order, including amendments or modifications to satisfy section 1129(b) of the Bankruptcy Code, and (ii) after entry of the Confirmation Order, the Debtor or the Reorganized Debtor, as the case may be, may, upon order of the Court, amend or modify the Plan, in accordance with section 1127(b) of the Bankruptcy Code.  Notwithstanding the foregoing, the Confirmation Order shall authorize the Debtor or the Reorganized Debtor, as the case may be, to make appropriate technical adjustments, remedy any defect or omission, or reconcile any inconsistencies in the Plan, the documents included in the Plan Supplement, any and all exhibits to the Plan, or the Confirmation Order, as may be necessary to carry out the purposes and effects of the Plan, provided, however, that such action does not materially and adversely affect the treatment of holders of Allowed Claims or Equity Interests pursuant to the Plan.

**F.        Revocation or Withdrawal of the Plan**

The Debtor reserves the right to revoke or withdraw the Plan at any time before the Effective Date.  If the Debtor revokes or withdraws the Plan prior to the Effective Date, or if the Confirmation Date or the Effective Date does not occur, the Plan, any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain any Claim or Equity Interest or Class of Claims or Equity Interests), the assumption or rejection of Executory Contracts, Unexpired Leases or benefit plans effected by the Plan, any release, exculpation, or indemnification provided for in the Plan, and any document or agreement executed pursuant to

the Plan shall be null and void. In such event, nothing contained in the Plan, and no acts taken in preparation for consummation of the Plan shall be deemed to constitute a waiver or release of any Claims by or against or Equity Interests in the Debtor or any other Person, to prejudice in any manner the rights of the Debtor or any Person in any further proceedings involving the Debtor, or to constitute an admission of any sort by the Debtor or any other Person.

## IX.    JURISDICTION OF BANKRUPTCY COURT

### A.    Retention of Jurisdiction

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the Court shall retain exclusive jurisdiction over all matters arising out of, or related to, the Chapter 11 Case and the Plan pursuant to sections 105(a) and 1142 of the Bankruptcy Code, including jurisdiction:

(i)    to resolve any matters related to (a) the assumption, assumption and assignment, or rejection of any Executory Contract or Unexpired Lease to which the Debtor or the Reorganized Debtor is party or with respect to which the Debtor or the Reorganized Debtor may be liable and to hear, determine, and, if necessary, liquidate, any Claims arising therefrom, including Cure Claims pursuant to section 365 of the Bankruptcy Code; and (b) any dispute regarding whether a contract or lease is or was executory or expired;

(ii)    to determine, adjudicate, or decide any other applications, adversary proceedings, contested matters, and any other matters pending on the Effective Date;

(iii)    to ensure that distributions to holders of Allowed Claims and Equity Interests are accomplished as provided in the Plan;

(iv)    to resolve disputes as to the ownership of any Claim or Equity Interest;

(v)    to allow, disallow, determine, liquidate, classify, estimate, or establish the priority, secured or unsecured status, or amount of any Claim or Equity Interest, including the resolution of any request for payment of any Administrative Claim, the resolution of Claims asserted against or payable from any of the Debtor's insurance policies, and the resolution of any and all objections to the secured or unsecured status, priority, amount, or allowance of Claims or Equity Interests;

(vi)    to enter and implement such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, revoked, reversed, modified, or vacated;

(vii)    to issue such orders in aid of execution of the Plan, to the extent authorized by section 1142 of the Bankruptcy Code;

(viii)    to consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any order of the Court, including the Confirmation Order;

(ix)    to hear and determine disputes arising in connection with the interpretation, implementation, consummation, or enforcement of the Plan;

(x)    to hear and determine any issue for which the Plan requires a Final Order of the Court;

(xi)    to hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

(xii)    to hear and determine all applications for an disputes arising in connection with compensation and reimbursement of expenses of Professionals for services rendered during the period commencing on the Petition Date through and including the Effective Date;

(xiii)    to hear and determine any Causes of Action (including Avoidance Actions) preserved under the Plan;

(xiv)    to hear and determine any matter regarding the existence, nature, and scope of the Debtor's discharge;

(xv)    to hear and determine any matter, case, controversy, suit, dispute, or Cause of Action (i) regarding the existence, nature, and scope of the discharge, releases, injunctions, and exculpation provided under the Plan, and (ii) enter such orders as may be necessary or appropriate to implement such discharge, releases, injunctions, exculpations, and other provisions;

(xvi)    to enter a final decree closing the Chapter 11 Case;

(xvii)    to issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any entity with consummation or enforcement of the Plan;

(xviii)    to adjudicate any and all disputes arising from or relating to distributions under the Plan;

(xix)    to enforce all orders previously entered by the Court; and

(xx)    to hear any other matter not inconsistent with the Bankruptcy Code.

For the avoidance of doubt, the Court shall not retain exclusive jurisdiction with respect to the Reorganized Debtor Operational Documents.

## X.    MISCELLANEOUS PROVISIONS

### A.    Immediate Binding Effect.

Notwithstanding Bankruptcy Rules 3020(e), 6004(h), 7062, or otherwise, upon the occurrence of the Effective Date, the terms of the Plan shall be immediately effective and enforceable and deemed binding upon the Debtor, the Reorganized Debtor, and any and all

holders of Claims or Equity Interests (irrespective of whether such Claims or Equity Interests are deemed to have accepted the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, discharges, and injunctions described in the Plan, each Entity acquiring property under the Plan, and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtor.  The rights, benefits and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor or assign of such Entity.

## B.    Governing Law.

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules), the laws of the State of Delaware (without reference to the conflicts of laws provisions thereof that would require or permit the application of the law of another jurisdiction) shall govern the construction and implementation of the Plan and any agreements, documents, and instruments executed in connection with the Plan, unless otherwise specified.

## C.    Filing or Execution of Additional Documents.

On or before the Effective Date or as soon thereafter as is practicable, the Debtor or the Reorganized Debtor shall (on terms materially consistent with the Plan) file with the Court or execute, as appropriate, such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.

## D.    Term of Injunctions or Stays.

All injunctions or stays provided for in the Chapter 11 Case under sections 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the Effective Date.

## E.    Exemption From Transfer Taxes.

Pursuant to, and to the fullest extent permitted by, section 1146(a) of the Bankruptcy Code, all transfers of property pursuant hereto, including (i) the issuance, transfer, or exchange under the Plan of any securities, (ii) the making or assignment of any lease or sublease, or (iii) the making or delivery of any other instrument whatsoever, in furtherance of or in connection with the Plan, shall not be subject to any stamp, conveyance, mortgage, sales or use, real estate transfer, recording, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forgo the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, recordation fee, or governmental assessment.

## F.    Plan Supplement.

All exhibits and documents included in the Plan Supplement are incorporated into and are a part of the Plan as if set forth in full in the Plan. Holders of Claims or Equity Interests may obtain a copy of the Plan Supplement upon written request to counsel to the Debtor. The Debtor reserves the right, in accordance with the terms hereof, to modify, amend, supplement, restate, or withdraw any part of the Plan Supplement after they are filed.

### G.      Conflicts.

The terms of the Plan shall govern in the event of any inconsistency between the Plan and the Disclosure Statement. In the event of any inconsistency with the Plan and the Confirmation Order, the Confirmation Order shall govern with respect to such inconsistency.

### XI.      GENERAL INFORMATION ON VOTING AND CONFIRMATION PROCEDURE

### A.      Voting On the Plan

The following is a summary of the procedures and requirements that have been established for voting on the Plan. If you are entitled to vote to accept or reject the Plan, you should receive a Ballot for the purpose of voting on the Plan. If you are entitled to vote and did not receive a Ballot, or you received a damaged Ballot, or you lost your Ballot, please contact the Debtor or the Balloting Agent.

IT IS IMPORTANT THAT HOLDERS OF CLAIMS ENTITLED TO VOTE FOLLOW THE SPECIFIC INSTRUCTIONS PROVIDED ON OR ACCOMPANYING SUCH HOLDER'S BALLOT.

THE DEBTOR WILL SEEK TO SATISFY THE REQUIREMENTS FOR CONFIRMATION OF THE PLAN UNDER THE CRAMDOWN PROVISIONS OF SECTION 1129(B) OF THE BANKRUPTCY CODE AS TO CLASSES 4, 5, AND 6.

SUBJECT TO THE TERMS AND CONDITIONS OF THE PLAN, THE DEBTOR RESERVES THE RIGHT TO AMEND THE PLAN EITHER BEFORE OR AFTER THE CONFIRMATION DATE.

AMENDMENTS TO THE PLAN THAT DO NOT MATERIALLY AND ADVERSELY AFFECT THE TREATMENT OF CLAIMS MAY BE APPROVED BY THE BANKRUPTCY COURT AT THE CONFIRMATION HEARING WITHOUT THE NECESSITY OF RESOLICITING VOTES.

### B.      Voting Record Date

The Court has set _____, 2018 as the "**Voting Record Date**" for the determination of the holders of Claims entitled to vote to accept or reject the Plan and the amount of such Claims.

1.      *Who May Vote*

Pursuant to section 1126 of the Bankruptcy Code, only the holders of Claims in Classes that are Impaired by, and are receiving distributions under, the Plan may vote on the Plan. Holders of Claims that are Unimpaired by the Plan are deemed to accept the Plan and do not have the right to vote on the Plan. Holders of Claims that are Impaired by the Plan and are not receiving a distribution are deemed to reject the Plan and do not have the right to vote on the Plan. Administrative Claims, Fee Claims, DIP Facility Claims, and Priority Tax Claims are not generally classified for purposes of voting or receiving distributions under the Plan.

Further, only the following holders of Claims in the Voting Classes shall be entitled to vote with regard to such Claims:

- holders of Claims who, on or before the Voting Record Date, have timely filed a Proof of Claim (or an untimely Proof of Claim which has been Allowed as timely by the Court under applicable law on or before the Voting Record Date) that (i) (a) has not been expunged, disallowed, disqualified, withdrawn or superseded prior to the Voting Record Date; and (b) is not the subject of a pending objection, other than a "reduce and allow" objection, filed with the Court at least seven days prior to the Voting Deadline; <u>provided</u>, <u>however</u>, that the holder of a Claim that is the subject of a pending objection on a "reduce and allow" basis shall be entitled to vote such Claim in the reduced amount contained in the objection; or (ii) is the subject of a pending objection but has been provisionally allowed for voting purposes only by order of the Court pursuant to Bankruptcy Rule 3018 before the Voting Deadline.

- holders of Claims that are listed in the Schedules, other than Claims that are scheduled as contingent, unliquidated or disputed and that have not been superseded by a timely filed Proof of Claim;

- holders of Claims that arise pursuant to an agreement or settlement with the Debtor, as reflected in a document filed with the Court, in an order of the Court or in a document executed by the Debtor pursuant to authority granted by the Court, in each case regardless of whether a Proof of Claim has been filed; and

- the assignee of a timely filed Claim or a Claim listed in the Schedules as noncontingent, undisputed and liquidated shall be permitted to vote such Claim only if the transfer or assignment has been fully effectuated pursuant to the procedures set forth in Bankruptcy Rule 3001(e) prior to or on the Voting Record Date, <u>provided</u> that, for the avoidance of doubt, that the assignor will not receive a Solicitation Package with respect to such Claim.

**In this Chapter 11 Case, holders of Claims in Class 1 are entitled to vote to accept or reject the Plan**. If you are entitled to vote to accept or reject the Plan, a Ballot has been enclosed for the purpose of voting.

    **2.**     *Eligibility*

In order for a holder of a Claim to be entitled to vote to accept or reject the Plan, the holder's Claim must be listed on the Debtor's Schedules of Assets and Liabilities or set forth on a filed proof of claim.

    **3.**     *Binding Effect*

Whether a holder of an Allowed Claim votes on the Plan or not, such holder shall be bound by the terms of the Plan if the Plan is confirmed by the Bankruptcy Court.

**C.**     **Procedure/Voting Deadlines**

In order for your vote to be counted, you must complete, date, sign and properly mail or deliver the enclosed Ballot to the Balloting Agent by no later than _____, **2018 at 4:00 p.m. (ET)**, by one of the methods set forth below:

|  |  |
|---|---|
| By First Class Mail, | ABT Molecular Imaging, Inc. Case Administration |
| Overnight Mail or | c/o GCG |
| Hand Delivery: | 5151 Blazer Parkway, Suite A |
|  | Dublin, OH 43017 |

Once you have delivered your Ballot to the Balloting Agent, you may change your vote by submitting to the Balloting Agent a valid subsequent Ballot to be received by the Voting Deadline. If multiple Ballots are received from the same holder with respect to the same Claim prior to the Voting Deadline, the last properly completed and executed Ballot timely received will be deemed to reflect such holder's intent and will supersede and revoke any prior Ballot.

Holders must vote all of their Claims within a particular Class either to accept or reject the Plan and may not split any votes. A Ballot that partially rejects and partially accepts the Plan will be counted as an acceptance of the Plan. Further, to the extent there are multiple Claims within the same Class held by a single holder, the Debtor may, aggregate the Claims of any particular holder within a Class for voting purposes as if such holder held one Claim within that Class and for purposes of the numerosity requirement of 1126(c) of the Bankruptcy Code the votes related to such Claims shall be treated as a single vote to accept or reject the Plan.

You are urged to timely complete, date, sign and promptly return the original enclosed Ballot by mail, courier service or hand delivery. Delivery of a Ballot to the Balloting Agent by facsimile, email or any other electronic means will not be valid.

Please be sure to complete the Ballot properly and legibly, identifying the exact amount of your Claim, the Class or Classes in which the Claim(s) is/are classified under the Plan and the name of the Creditor.

### D.  Plan Confirmation Process

#### 1.  *Requirements*

The requirements for confirmation of the Plan are set forth in detail in section 1129 of the Bankruptcy Code.  The following summarizes some of the pertinent requirements:

(a)  *Acceptance by All Impaired Classes*

Except as noted below, each Impaired Class of Claims must vote to either accept the Plan or be deemed to accept the Plan.  "Impaired" is defined in section 1124 of the Bankruptcy Code.  A Claim or Equity Interest is Impaired unless the Plan leaves unaltered the legal, equitable, or contractual rights of the holder.  Under the Plan, Claims in Classes 1, 4, 5, and 6 are Impaired.  No distributions are proposed for Claims in Classes 4, 5, and 6 and such Classes are deemed to reject the Plan.

As a voting Creditor, your acceptance of the Plan is important.  In order for the Plan to be accepted by an Impaired Class of Claims, holders with a majority in number and two-thirds in dollar amount of the Claims voting (of the voting Class of Claims) must vote to accept the Plan.  At least one Impaired Class, excluding the votes of Insiders (if any), must actually vote to accept the Plan.

(b)  *Feasibility*

Pursuant to section 1129(a)(11) of the Bankruptcy Code, the Bankruptcy Court must determine, among other things, that confirmation of the Plan is not likely to be followed by the liquidation or need for further financial reorganization of the Debtor or any successors to the Debtor under the Plan, unless such liquidation or reorganization is proposed in the Plan.  In addition, section 1129(a)(12) of the Bankruptcy Code requires that all fees payable under section 1930 of title 28 of the United States Code, as determined by the Bankruptcy Court at the hearing on Confirmation of the Plan, have been paid or the Plan provides for the payment of all such fees on the Effective Date of the Plan.  These conditions are often referred to as the "feasibility" of the Plan.  The Plan is a reorganization plan and is predicated upon the continuation of business by the Reorganized Debtor.

The projections prepared by the Debtor are included in the feasibility analysis (the "**Feasibility Analysis**") attached hereto as <u>Exhibit B</u>.  The Debtor believes the projections are reasonable and achievable.  As will be demonstrated by the Feasibility Analysis, the Debtor's post-Effective Date cash flow is sufficient to fund the Reorganized Debtor's business and distributions required under the Plan.

As a result of the above, the Plan satisfies the feasibility test.  Moreover, the Plan provides for payment of all statutory fees due and owing to the United States Trustee.  Accordingly, the Debtor believes that the Plan satisfies the requirements of feasibility under section 1129(a) of the Bankruptcy Code.

(c)     *"Best Interests" Test*

Pursuant to section 1129(a)(7) of the Bankruptcy Code, the Bankruptcy Court must find that the Plan is in the best interests of holders of Claims and Equity Interests (commonly referred to as the "**Best Interests Test**").  To satisfy the "Best Interests" test, the Bankruptcy Court must determine that each holder of an Impaired Claim or Impaired Equity Interest either: (i) has accepted the Plan; or (ii) will receive or retain under the Plan money or other property which, as of the Effective Date, has a value not less than the amount such holder would receive if the Debtor's property were liquidated under chapter 7 of the Bankruptcy Code on that date.

The first step in meeting the "Best Interests" test is to determine the proceeds that would be generated from the hypothetical liquidation of the Debtor's assets and properties in the context of a chapter 7 liquidation.  The gross amount of cash and cash equivalents available would be the sum of the proceeds from the disposition of the Debtor's assets and the cash held by the Debtor at the time of the commencement of its chapter 7 case.  Such amount is reduced by the amount of any Claims secured by such assets, the costs and expenses of the liquidation, and such additional administrative expenses and priority claims that may result from the termination of the Debtor's business and the use of chapter 7 for the purposes of a liquidation.

i.        Costs and Expenses of Liquidation

In a chapter 7 liquidation, a trustee in bankruptcy would be appointed.  The net amount generated from the liquidation of the Debtor's assets would be reduced by the administrative expenses of both the chapter 7 case and the Chapter 11 case, including the fees and commissions of the chapter 7 trustee, as well as those of counsel and other professionals that might be retained by the chapter 7 trustee, in addition to unpaid expenses incurred by the Debtor during the Chapter 11 case.  These expenses and costs would reduce the net proceeds available to holders of Allowed Claims or Allowed Equity Interests.

Any remaining net cash would be allocated to creditors and interest holders in strict accordance with the priorities set forth in section 726 of the Bankruptcy Code.  The present value of such allocation of the hypothetical liquidation proceeds (after deducting the amounts described above) is then compared with the present value of the proposed distributions under the Plan to each of the Classes of Claims and Interests to determine if the Plan is in the best interests of each holder of a Claim or Interest.

If the present value of the distributions available to unsecured creditors under the hypothetical liquidation is less than or equal to the present value of the distributions available to unsecured creditors under the Plan, then the Plan is in the best interests of creditors and can be considered in the "best interests of creditors" by the Bankruptcy Court.

ii.        The Plan Meets the Best Interests Test

The Debtor believes that the Plan will produce a recovery for certain holders of Claims that would be equal to or better than would be achieved in a chapter 7 liquidation and will produce recoveries for certain other creditors that are not worse than would be achieved in a chapter 7 liquidation.

Importantly, a chapter 7 liquidation would likely result in an increase in Administrative Claims, because there would be an additional tier of Administrative Claims by the chapter 7 trustee and his or her professionals. The chapter 7 trustee's professionals, including legal counsel and accountants, would add administrative expenses that would be entitled to be paid ahead of Allowed Claims against the Debtor. The Estate would also be obligated to pay all unpaid expenses incurred by the Debtor during the Chapter 11 Case (such as compensation for professionals), which would continue to be allowed in the chapter 7 case as well. In addition, the cash to be distributed to holders of Claims would be reduced by the chapter 7 trustee's statutory fee, which is calculated on a sliding scale from which the maximum compensation is determined based on the total amount of moneys disbursed or turned over by the chapter 7 trustee. Finally, it is likely that distributions from a chapter 7 estate would be significantly deferred. As a result, the present value of such distributions is likely to be lower than if made under the Plan.

For the reasons set forth above, the Debtor believes that the Plan provides a recovery at least equal to, if not better than, the recovery in a chapter 7 case for certain holders of Claims, and the Plan meets the requirements of the Best Interests Test. Other holders of Claims and Equity Interests and receiving nothing under the Plan and likewise would receive nothing in a chapter 7 case. A Liquidation Analysis to the same effect is attached to this Disclosure Statement as <u>Exhibit C</u>.

(d)    ***"Cramdown" Provisions***

Pursuant to section 1129(b) of the Bankruptcy Code, the Bankruptcy Court may confirm a plan even though a class of claims or equity interests has not voted to accept the plan, as long as one impaired class of claims has accepted the plan (excluding the votes of Insiders, if any) and the plan is "fair and equitable" and "does not discriminate unfairly" against the non-accepting classes.

The Plan impairs four Classes of Claims and all Equity Interests. The Debtor may, if applicable, pursue confirmation through a "cramdown" provision under section 1129(b)(2)(B), which states, in pertinent part, that a plan must be "fair and equitable" to such dissenting class and does not discriminate unfairly against such dissenting class. A plan is "fair and equitable" to a secured creditor class if, among other possible treatment, the plan provides the secured creditor with the "indubitable equivalent" of its claim. A plan is "fair and equitable" to other creditor classes if no holder of any claim that is junior to the claims of such class will receive or retain, on account of such junior claim, any property unless the senior class is paid in full. A plan is "fair and equitable" to a class of equity interests if no holder of any equity interest that is junior to the equity interests of such class will receive or retain, on account of such junior equity interest, any property unless the senior class is paid in full.

A plan does not discriminate unfairly if the legal rights of a dissenting class are treated in a manner consistent with the treatment of other classes whose legal rights are similar to those of the dissenting class and if no class receives more than it is entitled to receive on account of its claim or interest. The Debtor will invoke the "cramdown" provisions of section 1129(b)(2) of the Bankruptcy Code.

### 2.    *Confirmation Hearing*

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a hearing on confirmation of a plan.  To confirm the Plan, the Bankruptcy Court must hold a hearing to determine whether the Plan meets the requirements of section 1129 of the Bankruptcy Code (the "**Confirmation Hearing**").  The Confirmation Hearing has been set for _____ at _____ (ET).

## XII.    RISK FACTORS

ALL IMPAIRED HOLDERS OF CLAIMS SHOULD READ AND CAREFULLY CONSIDER THE FACTORS SET FORTH BELOW, AS WELL AS THE OTHER INFORMATION SET FORTH OR OTHERWISE REFERENCED IN THIS DISCLOSURE STATEMENT, PRIOR TO VOTING TO ACCEPT OR REJECT THE PLAN.

### A.    **Bankruptcy Factors**

### 1.    *Classifications of Claims and Equity Interests*

Parties in interest may object to the Debtor's classification of Claims and Equity Interests.  Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests in such class.  The Debtor believes that the classification of Claims and Equity Interests under the Plan complies with the requirements set forth in the Bankruptcy Code. Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

### 2.    *Non-Occurrence of the Effective Date*

If the conditions precedent to the Effective Date, which are set forth in the Plan, have not been satisfied or waived, the Bankruptcy Court may vacate the Confirmation Order.  THERE CAN BE NO ASSURANCE THAT ALL OF THE VARIOUS CONDITIONS PRECEDENT TO THE EFFECTIVE DATE OF THE PLAN WILL BE TIMELY SATISFIED OR WAIVED. In the event that the conditions precedent to the Effective Date have not been timely satisfied or waived, the Plan would be deemed null and void and (i) the Debtor or another party-in-interest may propose or solicit votes on an alternative plan that may not be as favorable to parties-in-interest as the current Plan, (ii) the Chapter 11 Case could be converted to a case under chapter 7 of the Bankruptcy Code; or (iii) the Chapter 11 Case could be dismissed.

### 3.    *Failure to Receive Requisite Accepting Votes*

There can be no assurance that the requisite acceptances to confirm the Plan will be received.  In order for the Plan to be accepted, of those holders of Claims who cast Ballots, the affirmative vote of at least two-thirds (2/3) in amount and more than one-half (1/2) in number of Allowed Claims in each voting Class is required.

If the requisite votes are not received, the Chapter 11 Case could be converted into a case under chapter 7 of the Bankruptcy Code or dismissed.  There can be no assurance that the

distributions under a chapter 7 liquidation or dismissal would be similar to or as favorable to holders of Claims as those proposed in the Plan.  ABT believes that distributions to holders of Claims would be significantly reduced and delayed under a chapter 7 liquidation, as discussed herein, above.

4.    *Nonconsensual Confirmation*

The Debtor intends to seek Confirmation over the rejection of the Plan by Classes 4, 5, and 6.  Although the Debtor believes that the Plan satisfies the nonconsensual Confirmation requirements of section 1129(b) of the Bankruptcy Code, there can be no assurance that the Bankruptcy Court will reach the same conclusion.  In addition, the pursuit of nonconsensual Confirmation or consummation of the Plan may result in, among other things, delay and increased expenses relating to Administrative Expense Claims of professionals.

5.    *Failure to Confirm the Plan*

Even if the requisite acceptances are received, there can be no assurance that the Bankruptcy Court will confirm the Plan.  A non-accepting creditor or equity holder of the Debtor might challenge the confirmation of the Plan or the balloting procedures or voting results as not being in compliance with the Bankruptcy Code or Bankruptcy Rules.  Even if the Bankruptcy Court determines that the Disclosure Statement and the balloting procedures and results are appropriate, the Bankruptcy Court could decline to confirm the Plan if it finds that any of the statutory requirements for confirmation have not been met, including that the terms of the Plan are fair and equitable to non-accepting Classes.

Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation and requires, among other things, a finding by the Bankruptcy Court that the Plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting Classes and that the value of distributions to non-accepting holders of Claims or Equity Interests within a particular Class under the Plan will not be less than the value of distributions such holders would receive if the Debtor was liquidated under chapter 7 of the Bankruptcy Code.  While there can be no assurance that these requirements will be met, the Debtor believes that non-accepting holders within each Class under the Plan will receive distributions at least as great as would be received following a liquidation under chapter 7 of the Bankruptcy Code when taking into consideration all administrative claims and costs associated with any such chapter 7 case.

If the Plan is not confirmed, it is unclear what holders of Claims or Equity Interests ultimately would receive with respect to their Claims and Equity Interests.  If an alternative Plan could not be agreed to, it is possible that the Debtor would convert the Chapter 11 Case to a chapter 7 case or dismiss the Chapter 11 Case, in which case it is likely that holders of Claims or Equity Interests would receive substantially less favorable treatment than they would receive under the Plan.

In addition, in the event that the Plan is not confirmed, the Debtor could incur substantial expenses related to the development and confirmation of a new plan and possibly the approval of a new disclosure statement.  This would only unnecessarily prolong the administration of the Debtor's assets and negatively affect Creditors' recoveries on their Claims.

Similarly, as described above, in the event the Chapter 11 Case is converted to a case under chapter 7 of the Bankruptcy Code, the Debtor will incur substantial expenses related to hiring additional professionals and paying the fees of the chapter 7 trustee. The additional cost will only serve to reduce distributions to Creditors.

### 6.     *Risk of Additional or Larger Claims*

The Disclosure Statement necessarily includes estimates, including estimates of future events and unliquidated Claims. These estimates include estimates as to the total amount of Claims that will be asserted against the Debtor. The Debtor believes that the estimates presented are reasonable and appropriate under the circumstances. Nevertheless, there is a risk that unforeseen future events may cause one or more of these estimates to be materially inaccurate. Among the potential risks are the following: (i) additional prepetition or Administrative Claims may be asserted; (ii) Disputed Claims may be resolved at higher amounts than expected; or (iii) the resolution of Claims may require the expenditure of unanticipated professional fees.

### 7.     *Alternative Chapter 11 Plan*

If the Plan is not confirmed, any other party-in-interest may attempt to formulate an alternative chapter 11 plan. However, the Debtor believes that such an alternative chapter 11 plan will necessarily be significantly inferior to the Plan proposed herewith. The prosecution of an alternative chapter 11 plan would unnecessarily delay creditors' receipt of distributions and, due to the incurrence of additional administrative expenses during such period of delay, may provide for smaller distributions to holders of Allowed Claims than are currently provided for in the Plan. Accordingly, the Debtor believes that the Plan will enable all holders of Claims to realize the greatest possible recovery on their respective Claims and with the least delay.

### 8.     *Variances from Projections*

The projections reflect assumptions concerning, among other things, ABT's operations prior to the Effective Date and on-going business operations following the Effective Date. ABT believes that the assumptions underlying the projections are reasonable; however, unanticipated events occurring subsequent to the preparation of the projections may affect the actual financial results of the Debtor or the Reorganized Debtor. The projections have not been compiled, audited, or examined by independent accountants and the Debtor makes no representations or warranties regarding the accuracy of the projections or the ability to achieve forecasted results.

### 9.     *Certain tax considerations*

There are a number of income tax considerations, risks, and uncertainties associated with consummation of the Plan. Holders of Claims should carefully review Section XIII hereof, "Certain Federal Income Tax Consequences of the Plan," regarding certain U.S. federal income tax consequences of the transactions proposed by the Plan to the Debtor and the Reorganized Debtor and certain holders of Claims.

10.    *The Debtor's emergence from chapter 11 is not assured*

While the Debtor expects to emerge from chapter 11, there can be no assurance that the Debtor will successfully reorganize or when this reorganization will occur, irrespective of the Debtor's obtaining Confirmation of the Plan.

## XIII.    CERTAIN FEDERAL INCOME TAX CONSEQUENCES

The following discussion is a summary of certain material United States federal income tax consequences of the consummation of the Plan to the Debtor and certain holders of Claims. It is for general information purposes only, and should not be relied upon for purposes of determining the specific tax consequences of the Plan with respect to a particular holder of a Claim or Equity Interest. This discussion is provided for information purposes and does not purport to be a complete analysis or listing of all potential tax considerations.

This discussion is based on provisions of the Internal Revenue Code of 1986, as amended (the "IRC"), proposed Treasury Regulations promulgated thereunder, administrative rulings and practice of the U.S. Internal Revenue Service (the "IRS"), other applicable authorities, and court decisions, all as in effect on the date hereof. Legislative, judicial, or administrative changes or interpretations enacted or promulgated after the date hereof could alter or modify the analyses set forth below with respect to the United States federal income tax consequences of the Plan. Any such changes or interpretations may be retroactive and could significantly affect the United States federal income tax consequences of the Plan. To the extent that the following discussion relates to the consequences to holders of Allowed Claims or Equity Interests, it is limited to holders that are United States persons within in the meaning of the IRC. For purposes of the following discussion, a "United States person" is any of the following:

•    An individual who is a citizen or resident of the United States;

•    A corporation created or organized under the laws of the United States or any state or political subdivision thereof;

•    An estate, the income of which is subject to federal income taxation regardless of its source; or

•    A trust that (a) is subject to the primary supervision of a United States court and which has one or more United States fiduciaries who have the authority to control all substantial decisions of the trust, or (b) has a valid election in effect under applicable United States Treasury regulations to be treated as a United States person.

The federal income tax consequences of the Plan are complex and are subject to significant uncertainties. No ruling has been or will be requested or obtained from the IRS with respect to any tax aspects of the Plan and no opinion of counsel has been or will be sought or obtained with respect thereto. Thus, no assurance can be given as to whether the IRS will agree with the assertions and conditions discussed herein. No representations or assurances are being made to the holders of Claims or Equity Interests with respect to the United States federal income tax consequences described herein. In addition, this summary does not address foreign, state or local tax consequences of the Plan. This discussion does not address all aspects of U.S. federal income taxation that may be relevant to the Debtor or a particular holder in light of its

particular facts and circumstances, or to certain types of holders subject to special treatment under the IRC or other applicable tax rules or regulations (such as governmental entities, banks, mutual funds, insurance companies, broker-dealers, tax-exempt organizations, real estate investment trusts, small business investment companies, regulated investment companies, holders that are or hold their Claims through a partnership or other pass-through entities (including subchapter S corporations), persons using a mark-to-market method of accounting, persons who are related to the Debtor within the meaning of the IRS, dealers in securities and foreign currencies, persons that have a functional currency other than the U.S. dollar, persons holding or that will hold Claims or New Common Stock as part of a hedge, straddle, constructive sale, conversion or other integrated transaction and holders of Claims who are themselves in bankruptcy), nor does it address any tax consequences related to the holding or disposition of New Common Stock. This discussion does not address the state, local, estate, gift or foreign tax consequences of the Plan and does not address the U.S. federal income tax consequences to Holders of Claims that are unimpaired under the Plan or Holders of Claims that are not entitled to receive or retain any property under the Plan. Furthermore, this discussion assumes that holders of Claims hold only Claims in a single Class and hold each Claim as a "capital asset" (within the meaning of Section 1221 of the IRC). Except as stated otherwise, this summary also assumes that the various debt and other arrangements to which the Debtor is a party will be respected for U.S. federal income tax purposes in accordance with their form.

Any discussion of United States federal tax issues set forth in this Disclosure Statement is written solely in connection with the confirmation of the Plan. A holder of a Claim or Equity Interest should seek advice based on their particular circumstances from an independent tax advisor.

EACH HOLDER IS HEREBY NOTIFIED THAT: (A) ANY DISCUSSION OF U.S. FEDERAL TAX ISSUES IN THIS DISCLOSURE STATEMENT IS NOT INTENDED OR WRITTEN TO BE RELIED UPON, AND CANNOT BE RELIED UPON, BY ANY HOLDER FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED ON A HOLDER UNDER THE TAX CODE; (B) SUCH DISCUSSION IS INCLUDED HEREBY BY THE DEBTOR IN CONNECTION WITH THE PROMOTION OR MARKETING BY THE DEBTOR OF THE TRANSACTIONS OR MATTERS ADDRESSED HEREIN; AND (C) EACH HOLDER SHOULD SEEK ADVICE BASED ON ITS PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

## A.      Certain U.S. Federal Income Tax Consequences to the Debtor and Reorganized Debtor

### 1.      Cancellation of Debt Income

Under the IRC, a U.S. taxpayer generally must include in gross income the amount of any cancellation of indebtedness ("COD") income recognized during the taxable year. COD income generally equals the excess of the adjusted issue price of the indebtedness discharged over the sum of (i) the amount of cash, (ii) the issue price of any new debt, and (iii) the fair market value of any other property (including stock) transferred by the debtor in satisfaction of such discharged indebtedness. COD income also includes any interest that has been previously accrued and deducted but remains unpaid at the time the indebtedness is discharged. However, COD income does not generally include income from discharge of a liability to the extent that a payment of such liability would have given rise to a deduction if paid.

The Debtor has material net operating loss ("NOL") carryforwards for U.S. federal income tax purposes as of the Petition Date.  The amount of the NOL carryforward may be adjusted downward as a result of COD Income and the elimination of certain Prepetition SWK Claims resulting from the holders exchanging such Claims for New Common Stock pursuant to the Plan.  The Debtor does not expect to recognize material COD income as a result of the elimination of any Claims other than potentially the Prepetition SWK Claims described above, including under the exception described above for amounts that would have been deductible if paid.  The NOL carryforwards, as adjusted, will remain with the Reorganized Debtor following consummation of the Plan.

       2.      Ownership Change.

The Debtor does not anticipate undergoing an "ownership change", under Section 382 of the IRC.  Consequently, the Debtor does not anticipate that the use of its NOL carryforwards will be subject to limitation following consummation of the Plan.

**B.**      **Certain U.S. Federal Income Tax Consequences to Holders of Allowed Claims**

The U.S. federal income tax consequences to holders of Allowed Claims arising from the distributions to be made in satisfaction of their Claims pursuant to a bankruptcy plan of reorganization may vary, depending upon, among other things: (a) the type of consideration received by the Holder of a Claim in exchange for such Claim; (b) the nature of such Claim; (c) whether the Holder has previously claimed a bad debt or worthless security deduction in respect of such Claim; (d) whether such Claim constitutes a security; (e) whether the holder of such Claim is a citizen or resident of the United States for tax purposes, or otherwise subject to U.S. federal income tax on a net income basis; (f) whether the holder of such Claim reports income on the accrual or cash basis; and (g) whether the holder of such Claim receives distributions under the Plan in more than one taxable year. For tax purposes, the modification of a Claim may represent an exchange of the Claim for a new Claim, even though no actual transfer takes place. In addition, where gain or loss is recognized by a holder, the character of such gain or loss as long-term or short-term capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the holder, whether the Claim constitutes a capital asset in the hands of the holder and how long it has been held or is treated as having been held, whether the Claim was acquired at a market discount, and whether and to what extent the holder previously claimed a bad debt deduction with respect to the underlying Claim. A holder who purchased its Claim from a prior holder at a market discount may be subject to the market discount rules of the IRC. Under those rules, assuming that the holder has made no election to amortize the market discount into income on a current basis with respect to any market discount instrument, any gain recognized on the exchange of its Claim (subject to a de minimis rule) generally would be characterized as ordinary income to the extent of the accrued market discount on such Claim as of the date of the exchange.

A holder who receives cash in exchange for its Allowed Claim will generally recognize income, gain or loss for U.S. federal income tax purposes in an amount equal to the difference between (i) the amount of cash received in exchange for its Allowed Claim, and (ii) the Holder's adjusted tax basis in its Allowed Claim that is treated as exchanged for cash.  The character of such income, gain or loss as ordinary income or loss or as capital gain or loss will be determined by a number of factors, including the tax status of the holder, the nature of the Allowed Claim in such holder's hands, whether the Allowed Claim constitutes a capital asset in the hands of the holder, whether the Allowed Claim was purchased at a discount, and whether and to what extent

the holder has previously claimed a bad debt deduction with respect to its Allowed Claim.  A holder of an Allowed Claim will generally recognize ordinary income to the extent that the amount of cash received (or to be received) under the Plan is attributable to interest that accrued on a Claim but was not previously paid by the Debtor or included in income by the holder of the Allowed Claim.  Conversely, holders previously required to include in their gross income any accrued but unpaid interest with respect to a Claim may be entitled to recognize a deductible loss to the extent such interest is not satisfied under the Plan.  Such loss should be ordinary. To the extent any amounts are paid to a holder in such holder's capacity as an employee and which for U.S. federal income tax purposes constitute wages, such amounts will generally be treated for tax purposes as ordinary income and will be subject to withholding by the Debtor.

C.      Backup Withholding Tax and Information Reporting Requirements

The Debtor will withhold all amounts required by law to be withheld from payments of interest.  The Debtor will comply with all applicable information reporting requirements of the IRC. Payments and other distributions in respect of Allowed Claims under the Plan may be subject to applicable information reporting and backup withholding.  Backup withholding of taxes will generally apply to payments in respect of an Allowed Claim under the Plan if the holder of such Allowed Claim fails to provide an accurate taxpayer identification number or otherwise fails to comply with the applicable requirements of the backup withholding rules.  The backup withholding tax rate is currently 28%.

Backup withholding is not an additional tax.  Amounts withheld under the backup withholding rules may be credited against a holder's U.S. federal income tax liability, and a holder may obtain a refund of any excess amounts withheld under the backup withholding rules by timely filing an appropriate claim for refund with the IRS.

In addition, from an information reporting perspective, U.S. Treasury Regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds. Holders are urged to consult their tax advisors regarding these regulations and whether the transactions contemplated by the Plan would be subject to these regulations and require disclosure on the holders' tax returns.

C.      **Importance of Obtaining Professional Tax Assistance**

**THE FOREGOING DISCUSSION IS INTENDED ONLY AS A SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL.  THE FOREGOING DISCUSSION IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT TAX ADVICE.  THE TAX CONSEQUENCES ARE UNCERTAIN IN MANY CASES AND MAY VARY DEPENDING ON A CLAIM HOLDER'S OR EQUITY INTEREST HOLDER'S PARTICULAR CIRCUMSTANCES. ACCORDINGLY, CLAIM HOLDERS AND INTEREST HOLDERS ARE URGED TO CONSULT THEIR TAX ADVISORS ABOUT THE UNITED STATES FEDERAL, STATE AND LOCAL, AND APPLICABLE FOREIGN INCOME AND OTHER TAX CONSEQUENCES OF THE PLAN.**

## XIV.   ALTERNATIVES TO THE PLAN

The Debtor has determined that the Plan is the most practical means of providing for maximum recoveries to the holders of Allowed Claims.  Alternatives to the Plan that have been considered and evaluated by the Debtor include liquidation of the Debtor's assets under chapter 7 of the Bankruptcy Code.  Through consideration of this alternative to the Plan, the Debtor has concluded that the Plan, in comparison, will likely provide a greater recovery to holders of Allowed Claims on a more expeditious timetable, and in a manner that minimizes certain risks inherent in any other course of action available to the Debtor.

If the Plan or any other chapter 11 plan for the Debtor cannot be confirmed under sections 1129(a) and (b) of the Bankruptcy Code, the Chapter 11 Case may be converted to a case under chapter 7 of the Bankruptcy Code, and a trustee would be elected or appointed to liquidate any remaining assets of the Debtor for distribution to holders of Allowed Claims and Equity Interests pursuant to chapter 7 of the Bankruptcy Code.  If a trustee is appointed and the remaining assets of the Debtor are liquidated under chapter 7 of the Bankruptcy Code, most Creditors and Equity Interest holders under the Plan may receive distributions of a lesser value on account of their Allowed Claims and Allowed Equity Interests and may have to wait a longer period of time to receive such distributions than they would under the Plan.  Holders of Claims and Equity Interests in Classes 4, 5, and 6 are receiving nothing under the Plan and would similarly receive nothing if the Debtor was liquidated under chapter 7 of the Bankruptcy Code.

## XV.   RECOMMENDATIONS

The Debtor believes that the Plan is substantially preferable to any other plan, preferable to liquidation under chapter 7 of the Bankruptcy Code.  Conversion to a case under chapter 7 or dismissal of the Chapter 11 Case would result in substantial delays in the distribution of proceeds available and would significantly increase administrative costs, and, therefore, would materially reduce the recoveries of holders of Claims receiving distributions.  Therefore, the Debtor strongly recommends that you vote in favor of the Plan.

## XVI.   CONCLUSION

It is important that you exercise your right to vote on the Plan.  The Debtor believes that the Plan fairly and equitably provides for the treatment of all Claims against, and Equity Interests in, the Debtor and recommends that you cast your Ballot in favor of the Plan.

Dated: September 26, 2018

**ABT MOLECULAR IMAGING, INC.**

By:*/s/ Peter Kingma*

Name:  Peter Kingma

Title:  Chief Executive Officer, President, Board Member